[1] This is an action for divorce and custody of minor child, filed in the Circuit Court of Lawrence County, Missouri, on the 11th day of August, 1948. On the 5th day of October, 1948, the cause was tried and plaintiff was granted a divorce and custody of minor child. From this judgment defendant appealed to this court.
[2] Plaintiff's first amended petition is as follows:
[3] "1. Plaintiff states that on the 22nd day of August, 1947, he was lawfully married to the defendant; that plaintiff continued to live with the defendant as her husband from and after the day and year aforesaid until August 11th, 1948; that during all of that time plaintiff faithfully demeaned himself and discharged all of his duties as the husband of the defendant, and at all times treated her with kindness and affection, but the said defendant, wholly disregarding her duties as the wife of plaintiff, offered to him such indignities as to render his condition in life intolerable in this to wit: That defendant constantly nagged and quarreled at plaintiff without just cause, and in general conducted herself in a manner unbecoming the wife of plaintiff in this, to-wit: That on or about Christmas, 1947, defendant went to Jefferson City, Missouri, to visit her parents, and remained away from home about one month; that when she returned she had contracted a venereal disease, and was so infected at the time she arrived at home; that defendant was nasty and filthy around the house, would not bathe herself nor the baby; that she would carry fruit jars to her room up-stairs and use them to urinate in and would leave them sitting under the bed, sometimes as many as six; that she would not cook; that she would go to her room and stay there and would not come down and eat with the rest of the family; that she would not wash her own clothes or her body; that she would have fits of temper and refrain from speaking to the plaintiff for two or three days at a time, and then would only answer such questions as were directed to her; that she gave the plaintiff no love or affection, and on occasions threatened to kill plaintiff and his family and herself.
[4] "2. Plaintiff states that there was born of the marriage one child of tender age, to-wit: Joan Taylor, an infant * * *."
[5] The answer of the defendant admits the marriage and the birth of the infant child and admits that she contracted venereal disease, but states that she contracted it from plaintiff and denies all of the other allegations in the petition. The answer prays for the custody of the minor child.
[6] The court found in his judgment that the plaintiff was the innocent and injured party; that he sustains a good moral character and is entitled to divorce and custody of the infant child. The court granted defendant the right to visit said child at reasonable times and places.
[7] We will refer to appellant as defendant and respondent as plaintiff in this opinion.
[8] Defendant relies upon two assignments of error for reversal in this case: First, that the grounds for divorce were condoned, and, second, that the minor child was of such tender age that the custody should have been granted to the mother.
[9] The evidence shows that plaintiff and the defendant were married August 22nd, 1947, at Miller, Missouri, and separated August 11th, 1948; that plaintiff was 25 years old and his wife 20. Plaintiff testified that prior to the marriage, he knew the defendant about 16 or 18 months; that he met her in June, 1946, at which time he lived in Jefferson City and defendant lived in Cedar City, just across the river from Jefferson City; that after their marriage they made their home with plaintiff's grandparents; that his grandfather is 70 years old and his grandmother 65. Plaintiff testified that defendant knew where they were to live prior to the marriage. He testified that on the 24th day of December, 1947, defendant went to visit her parents at Cedar City and remained there *Page 414 
until the 28th day of February, 1948; that she went home for Christmas. While defendant was visiting in Cedar City plaintiff filed suit for divorce, but testified that after he learned defendant was pregnant he dismissed his cause of action, brought her back to his home and lived with her until after the baby was born. The evidence showed that she stayed in plaintiff's home until the day that he filed this action for divorce, to-wit: August 11th, 1948, at which time plaintiff took the defendant to his sister's, who lived in the community, where she stayed all night and possibly the next day and then went with plaintiff's grandparents to her parent's home at Cedar City.
[10] These questions were asked plaintiff and he gave the following answers:
[11] "Q. When she went to Jefferson City to visit, were you on friendly terms then? Did she go on a friendly visit or how come her to go? A. Well, before then all this here stuff had come up * * * the way she had been treating me, or herself, wouldn't eat and went to her room and stayed; and I told her I was going to file for divorce. She didn't seem to care, so I did. At that time I didn't know she was pregnant, and she filed an answer; and then she asked me to drop it on account of being pregnant, so I did. So, that is the situation and the way I felt and she knew it too.
[12] "Q. And you filed suit for divorce while she was gone? A. Yes, sir * * *.
[13] "Q. After she came back in the home, how did she take care of herself so far as cleanliness? A. Same way, in fact, worse. She never done nothing then.
[14] "Q. How did you get along? Was she agreeable and could you talk to her? A. She never hardly talked to me at all until after I went to bed a lot of days; and sometimes I never even talked at all to her. She wouldn't even stay in the room where I was.
[15] "Q. Did you live together as husband and wife after she came from Jefferson City? A. We slept in the same bed.
[16] "Q. Did you have sexual intercourse after that? A. No, sir.
[17] "Q. Would she come down from her room and eat with the rest of you? A. If she felt like it, she would; if she didn't, she stayed in her own room * * *.
[18] "Q. Did she ever make any threats against your life? * * *. A. Yes, sir; many a time, and the baby's and all the folks there in the house.
[19] "Q. Threatened to kill them and the baby? A. And then herself, yes, sir."
[20] Now the evidence shows that after defendant returned from Jefferson City, to-wit: March, 1948, plaintiff took her to a doctor, believing she was pregnant, to have her examined and then learned that she had venereal disease.
[21] On cross-examination these questions and answers were asked and given:
[22] "Q. But you took her there believing she was pregnant? Now, when it was ascertained that she had a disease, you continued to take her to the doctor to have her treated? A. Yes, sir.
[23] "Q. And you were advised by the doctor that she was also pregnant? A. Yes, sir.
[24] "Q. And you continued to live with her after that time? A. Yes, sir.
[25] "Q. And sleep in the same bed with her? A. Just sleep, yes, sir.
[26] "Q. And you did live with her until the 11th day of August, 1948? A. That's right.
[27] "Q. Now when was this baby born? A. July 11th * * *.
[28] "Q. And as soon as she recovered from the hospital, you brought her back home? A. Yes, sir. She was in there, I believe, eight days. * * *
[29] "Q. You paid the hospital bill and you paid the doctor? A. Yes, sir.
[30] "Q. And you brought her and the baby home? A. That's right."
[31] The plaintiff testified that the child was healthy, a girl, and that he was its father. Then, on cross-examination, the following questions and answers were given:
[32] "Q. Now, you say she was nasty and filthy around the home? A. That's right. *Page 415 
[33] "Q. Has she always been that way since you lived with her? A. Yes, sir.
[34] "Q. Nasty and filthy before she went to Jefferson City? A. Yes, sir; that's how come me to first file.
[35] "Q. And then she continued to be nasty and filthy after you went back to her? A. Yes, sir.
[36] "Q. After you took her back? Now, you say that she would urinate in fruit jars and things like that. Did she do that before she went to Jefferson City? A. That's right * * *.
[37] "Q. Now, you say that she threatened to kill you and your family and child. What did she say about it? A. Well, there has been many a night that she said the same thing; said if she had a gun she would kill us all."
[38] Plaintiff testified that he drove a milk wagon and earned $90.00 a month; that he lived with his grandparents and they will assist him in taking care of the baby. He testified that his aunt, also, would assist him in taking care of the child; that she lived six miles from his place on a farm. She is a married woman and has one child eight years old.
[39] Plaintiff testified that he had never had gonorrhea; that the same doctor who examined his wife, examined him. The doctor testified that plaintiff did not have gonorrhea and showed no evidence of ever having had a venereal disease. Prior to the marriage, plaintiff served 46 months in the navy, 44 1/2 months being overseas and that he had an honorable discharge for good conduct.
[40] Dr. Frank Buscher testified, in answer to a question as to the ability of the defendant to care for her child, as follows: "A. I would be willing to say it is very unlikely she could give that child adequate care." This doctor waited on her during childbirth and treated her for gonorrhea. He testified that the child was born July 11th, 1948, and is a normally healthy baby.
[41] These questions were asked the doctor and his answers given:
[42] "Q. And what other reasons now do you base the idea that she is sub-normal mentally? A. Other than the fact I couldn't communicate with her, on one instance, May 13th, we had to admit her to the hospital; she hadn't had a bowel movement for approximately ten days and refused to do anything about it. During the time the girl was in the hospital after the baby was delivered, when we spoke to this girl, she had absolutely nothing to say.
[43] "Q. What do you say her mental condition is? A. I think she has a low mental capacity. That doesn't necessarily indicate the girl is insane * * *.
[44] "Q. What is wrong with her mind then? A. It is simply a matter of intelligence."
[45] The doctor testified that the girl's responses were not those of a normal woman; that she had a low I. Q.
[46] The plaintiff gave the following testimony:
[47] "Q. And what was the cause of your separation? What did she do? A. She was just filthy and I couldn't believe it.
[48] "Q. Do you want to elaborate on that by telling what you refer to? A. She left Kotex laying around the house and bottles with urine in them and soiled clothes and would stack them in the corners and dresser drawers and such places as that.
[49] "Q. In her room? A. Yes, sir.
[50] "Q. How did she conduct herself with respect to her household duties, cooking, washing and ironing? A. Never did none of that.
[51] "Q. You had an infant child born out there, did you? A. That's right.
[52] "Q. What was her behavior with respect to the child? Did she care for it? A. She bathed the baby one time; the rest of the time somebody else had to do it. * * *
[53] "Q. And who looked after the baby while living there with your grandparents? A. Grandma, mostly, whenever I wasn't there.
[54] "Q. Who prepared the baby's formula? A. I did.
[55] "Q. Who washed the baby's clothes and changed it? A. Grandma did." *Page 416 
[56] The testimony further showed that the defendant refused to stay in the room where her husband was, would stay by herself days at a time; wouldn't eat. When her husband came home from work she would go off to a room to herself and not see him. She refused to bathe herself or the baby. She showed no affection for her child, refused to touch it or care for it, and refused to wash her clothing or her family's clothing. She did not keep her room clean and did not sweep the floors.
[57] Mrs. Gwen Myers, an aunt of plaintiff, gave the following testimony:
[58] "Q. Did you have an opportunity to observe as to how his wife cared for herself and the room they lived in? A. Yes, sir.
[59] "Q. Tell the court what you observed. A. She didn't keep herself clean for the first thing as far as feminine hygiene was concerned, and I tried to talk to her, being married, I know what had to be done and if I could help make a success of the marriage, I wanted to do it.
[60] "Q. What did she do? A. You couldn't get her to answer you.
[61] "Q. How dirty would she be? A. Filthy.
[62] "Q. Any bugs? A. That's right. My mother called me, and I went over there and mother said, `Marie's head is full of lice.'
[63] "Q. Did she have lice? A. I helped to get rid of them."
[64] This witness testified that the only place she could see defendant was in her room; that her room was dirty.
[65] The testimony showed that the plaintiff lived with his grandparents in a six-room house, which is furnished comfortably; that he bore a good reputation for honesty and being a decent, hardworking man. The evidence showed that defendant's parents lived across the river from Jefferson City in over-flow land; that the family consists of mother, father and three little girls besides defendant; that they live in a five room house, which has two bedrooms. The house is not modern. The father works at a bakery earning $40.00 per week and pay for overtime. The mother has been working at the Missouri Hotel and earning $15.00 per week. The defendant is now working at the shoe factory.
[66] In Patterson v. Patterson, Mo.App., 215 S.W.2d 761, 763, this court stated the law with reference to the reviewing of divorce cases as follows: "The court of appeals, in reviewing a divorce case, has a duty to examine the evidence and reach its own conclusions, but has a duty, especially where there is irreconcilable conflict in the evidence, to defer largely to the finding of the trial judge. Callahan v. Callahan, Mo.App., 192 S.W.2d 48. * * *"
[67] This rule does not mean that the appellate court must blindly accept the findings of the trial court, but, where there is a conflict of testimony, the trial court is in a better position to judge the weight and credibility of witness. Thus the rule of due deference to the finding of the trial court. On the contrary, the appellate court has the positive duty to try the case de novo and reach its own conclusions on the fact. And it will not hesitate to disregard the findings of the lower court where its own consideration of the evidence impels the conclusion that such findings were erroneous. Rusche v. Rusche, Mo. App., 200 S.W.2d 577, 580; Fite v. Fite, Mo.App., 196 S.W.2d 65; Culp v. Culp, Mo.App., 164 S.W.2d 623, 626.
[68] The first contention of the defendant is that the court erred in granting plaintiff a divorce because the plaintiff, by continuing to cohabit with the defendant up until the date of the filing of his petition for divorce, with full knowledge of all the facts alleged by him, constituted a condonation of the grounds for divorce alleged in the petition. In support of this contention defendant cites Weber v. Weber, 195 Mo.App. 126, 189 S.W. 577. In this case the wife was granted a divorce on a cross-bill filed in plaintiff's action. The evidence showed that the wife had had sexual intercourse with her husband on two different nights after the filing of her cross-bill but had never actually returned to him, and the court held that the mere fact that the wife considered returning to her husband *Page 417 
after his commission of marital offenses, and that she did sleep with him two nights, is not conclusive of condonation when she did not actually return to him. The court did hold, in this case, that in cases of adultery, cohabitation is more nearly conclusive of condonation than if another offense were charged. We quote from the opinion of the court from 189 S.W. at page 578:
[69] "(1) The term `condonation,' as used in divorce proceedings, has no different meaning than when used with reference to the violation of any duty or obligation, and is used in the law of master and servant, lessor and lessee, etc. It means a forgiveness and pardon after full knowledge of past wrong, fault, or deficiency on condition, express or implied, that same will not be repeated.
[70] "(2) In divorce proceedings, cohabitation offers strong evidence of such pardon and forgiveness of past conjugal offenses, increasing in probative force with the fullness of knowledge of the offense committed and the length of time continued. In most cases where the cohabitation is long continued, it will be taken as conclusive evidence. Much must depend, however, on the circumstances of the particular case. * * *"
[71] In Jones v. Jones, 208 Mo.App. 632, 235 S.W. 481, cited by defendant and decided by this court, the facts show that the husband lived with his wife many years after she had committed the improper conduct complained of, with full knowledge thereof. We quote from this case, 235 S.W. at page 483; "They lived together for many years thereafter, and two children were born to them after that occurrence. If her conduct on that occasion had been criminal, as plaintiff contended, he had fully condoned it, and ought not to have mentioned it in his petition for divorce filed long afterward, and we think his doing so was, under the circumstances, an indignity against his wife."
[72] In Rusche v. Rusche, Mo.App., 200 S.W.2d 577, at page 582, the court makes the following statement of law: "As we have already pointed out, plaintiff contends that when he and defendant went back together in November, 1939, she condoned his past offenses, and that such offenses are consequently not to be held against him in determining his right to a divorce. There is no doubt that defendant did forgive his past transgressions. It is to be borne in mind, however, that condonation is not an absolute, but only a conditional, forgiveness. O'Neil v. O'Neil, Mo.App., 264 S.W. 61; Weber v. Weber, 195 Mo.App. 126, 189 S.W. 577; Ratcliff v. Ratcliff, 221 Mo.App., 944, 288 S.W. 794; Needham v. Needham, Mo.App., 299 S.W. 832. It presupposes that the offending party's marital obligations will thenceforth be observed; and if a breach of a condition inherent in the condonation subsequently takes place, the original grievance will be revived, whether or not the new offense is a repetition of the one condoned. * * *"
[73] Reviewing the evidence in the case at bar, under the law as revealed in the cases cited by plaintiff and defendant in their briefs, and as it exists in Missouri, we cannot agree with defendant that the acts complained of by plaintiff in his petition for divorce were condoned.
[74] The evidence shows that plaintiff's first petition for divorce was based upon general indignities, which consisted of misconduct of the defendant in carrying out her duties as wife of plaintiff. Among the acts complained of were that plaintiff was filthy with her person and in her methods of housekeeping; that she had lice; that she refused to cook for plaintiff, would not do her washing and refused to talk to plaintiff or associate with him and his family, and refused to eat and stayed in her room days at a time.
[75] Now the second petition is based upon a continuation of all these general indignities after the defendant returned to plaintiff, with the additional indignity that defendant had contracted a venereal disease. The evidence shows that the first petition was filed in December, 1947, and that plaintiff took his wife back and dismissed that suit for one reason only, and that was because he learned that his wife was pregnant and that he took her back to care for her until she had delivered her child; that he paid *Page 418 
the doctor bill and after defendant recovered from child delivery he filed suit for divorce, and on the day that he filed the suit he took her to his sister's home, some six miles from their home, and that plaintiff and defendant never cohabited thereafter.
[76] Plaintiff testified that although he occupied the same bed with the defendant after she returned to him on the 28th day of February, 1948, and remained with him until the 11th day of August, 1948, he did not have sexual relations with defendant. Plaintiff also testified that defendant's habits of being filthy and refusing to talk to him and refusing to eat and refusing to do her duties in caring for the home as alleged in his first petition, were continued by defendant after she returned to him.
[77] Under these facts we think that the trial judge was justified in granting plaintiff a divorce that the law presupposes that if such acts were condoned the defendant would, after her return, observe her marital obligations and that the original grievance would not be repeated Here, the court was justified in finding that the old offense was repeated and a new one committed thereby. We further believe, from the evidence, that plaintiff did not condone defendant's misconduct of having venereal disease. The mere fact that the plaintiff occupied a bed with defendant after her return, in our judgment, would not constitute condonation under the explanation given by plaintiff in the testimony. He never assumed marital relations but merely took defendant back to protect his own child, and now asks the court for custody thereof. This was a manly act on the part of plaintiff and, no doubt, had much weight with the trial court. Each case must be decided upon its own facts, and we find from the testimony in this case that the grounds relied upon by plaintiff in his petition for divorce were not condoned.
[78] Under defendant's second assignment of error she contends that the trial court erred in granting plaintiff custody of the infant child. She states that the age of the child is an important matter to be considered; and where the child is of tender years it needs, above all else, the tender love and affection of a mother, and if all else be equal, the child should be given to the custody of the mother. To sustain this contention defendant cites two cases. In the first case, Keith v. Keith, Mo.App., 95 S.W.2d 669, 672, the court made the following statement of law:
[79] "All things being equal, the courts are more inclined to feel that the proper place for minor children is with the mother, although such rule is by no means an inflexible one. Bedal v. Bedal, Mo.App., 2 S.W.2d 180.
[80] "In contests between parents for the custody of a child, the age of the child is an important matter to be considered; and if the child be one of tender years, it needs, above all else, the tender love and affection of a mother; and, if all else be equal, the child should be given into the custody of the mother."
[81] However, this same court holds that the best interest of the child should be the determining factor in awarding custody thereof, considering its moral and spiritual development and growth.
[82] An examination of the evidence in this case would lead us to believe that the trial court properly awarded the custody of this minor child to plaintiff because the mother was morally unfit and mentally incompetent to properly care for the infant child. The doctor testified that the mother was not a fit person to properly care for the child and the evidence of her personal habits were such as to impress any court that she was morally unfit to train and protect this infant child This conclusion is further supported by the fact that the defendant does not have a suitable home in which to rear this child. She lives with her father in a five room house, located across the river from Jefferson City, in an over-flow section; that her father and mother both are forced to work for a living; that they have three other children; that there are only two bedrooms in the house and the evidence shows that defendant, herself, is employed at the shoe factory. Combining this with the other testimony and with the fact that the testimony *Page 419 
showed plaintiff to be of good moral character, with sufficient ability to earn money to care for and educate his child, with the additional evidence that his grandparents occupy a comfortable home, with six rooms; that there are no other children in the home and that they are of good moral character and in good health, with the further consideration that plaintiff's sister, who lives some six miles from plaintiff's home and who seems to be interested in the child and agrees to assist plaintiff in its proper upbringing, certainly the court, under the evidence, was justified in finding that the best interest of this child was with the plaintiff.
[83] In the case of Abel v. Ingram, 223 Mo. App. 1087, 24 S.W.2d 1048, cited by defendant and decided by this court, the custody of minor children had been awarded the father and plaintiff filed a motion to change the custody of such children and award them to her. The custody of the children had been left with the grandparents on the father's side, and the court held that the custody of a child, whose actual custody is with the grandparents, the father having actual legal custody, must go to the mother unless she is known to be incompetent or unable to properly rear it. On page 1050 of 24 S.W.2d the court thus states the law: "The future good of the child is to be the only end to be sought by us in reaching a conclusion in this case, and, while either parent is able financially to properly feed, clothe, and educate this child, the mother can, and no doubt will, give it that which it needs vastly more than food and clothes, to wit, the tender care and influence of a mother during the period of its growth and development into womanhood. We feel that, under the absolute rules of law by which we are to be governed as applied to the facts developed in this case, the custody of the child should be awarded to its mother, and it will be so ordered."
[84] With the law in this case we fully agree, but, for the reasons set out above, we hold that the best interest of this minor child is with the father, where the trial court placed it.
[85] Judgment affirmed.
[86] VANDEVENTER, P. J., and BLAIR, J., concur. *Page 543