Neva NOLL (Plaintiff), Appellant,

v.

A. J. NOLL (Defendant), Respondent.

No. 22172.

Kansas City Court of Appeals.

Missouri.

April 4, 1955.

Robert N. Jones, St. Louis, for appellant.

Waldo Edwards, Macon, Austin Walden, Moberly, Errol Joyce, Edwin Yagel, Brookfield, for respondent.

SPERRY, Commissioner.

Plaintiff appeals from an order and judgment dismissing her petition for divorce and granting defendant a decree of divorce on his cross bill. Plaintiff was also allowed attorney fees, suit money and costs. The real and only question involved is whether the evidence supports the judgment.

We will review the case upon both the law and the evidence and reach our own conclusions, but we will not set aside the judgment unless it is clearly erroneous; and we will give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Phelps v. Phelps, Mo.App., 246 S.W.2d 838, 841; Johnson v. Johnson, Mo.App., 240 S.W.2d 184, 185.

Plaintiff was a Macon County woman who had previously been married and divorced, but who had no children. She was 45 years of age at the time of trial and was a woman

of education and intelligence, having been a school teacher. Defendant was, at the time of trial, 49 years of age, had been mayor of Macon a number of times, owned and operated automobile agencies in Macon, Moberly and Clarence, and owned numerous and valuable real estate properties in that area. He had previously been twice married to one woman, and twice divorced from her. He had a daughter by that marriage who, at the time of this trial, was 23 years of age and was married. No children were born to plaintiff and defendant. They were married at Macon, April 16, 1942, and separated May 25, 1952.

Two days later plaintiff filed petition for divorce, alleging infidelity and indignities, and that defendant had told her he no longer loved her but desired his freedom. Defendant answered by generally denying the charges of misconduct, and filed his cross petition charging plaintiff with cruelty, neglect of marital duties, and indignities. Each party was ably represented by several attorneys. The trial lasted several days, it being hotly contested on practically every issue presented by the pleadings (and some that were not!). The transcript covers more than 600 pages, including a fine memorandum by the learned trial judge wherein the testimony and issues are by him ably summarized. Both parties have filed excellent briefs.

We have carefully read and considered the entire record but we do not consider that the interests of justice require that the evidentiary facts be set out herein and discussed in great detail, but only to such extent as is necessary to an understanding of the issues and the evidence bearing thereon.

Defendant testified to the effect that, on the morning of the marriage, within a few hours thereafter, plaintiff humiliated him in a crowded restaurant and in the presence of friends and acquaintances, because he stopped at the table of a married couple, prominent citizens of Macon, and told a story; that she rebuked him and told him that he had no respect for women, and none for her. His testimony in this regard was corroborated by Mr. Baker, the party to whom the story was told.

He stated that, within a few months after the marriage, plaintiff accompanied him to his place of business at Moberly and, while he went over business matters with his secretary, a married employee, plaintiff remained in the show room within plain view of defendant; that, after a time, plaintiff stormed to the desk where he was dictating letters to the secretary and angrily demanded that he go with her back to Macon, charging that defendant and the employee were improperly interested in each other. This testimony was corroborated by the secretary and by a man employee who was present in the office throughout the whole time. The secretary was humiliated and came near resigning her position.

He stated that, in May or June, 1942, he drove to St. Louis, with his employee, Mr. Bowser; that plaintiff accompanied them in the car; that defendant stated that he would like to stop and buy his daughter a coat; that plaintiff said "No, I am going to shop"; that plaintiff further said, in the presence of Bowser, "You are so cheap you don't want to buy me even an ice cream cone but when we get back you are going to build me a $50,000 home, and pretty damned quick." This incident was verified by Mr. Bowser.

In the fall of 1942, a married couple had dinner in the home of these parties, and the husband asked defendant to take his wife, a newspaper reporter, to the council meeting (defendant being mayor); that, immediately after dinner, he and the lady went to the council meeting; that he returned at about 10:00 p. m.; that, the next night, in the presence of the maid, plaintiff said he left too soon after dinner and got back too late, that there was something between the lady and defendant; that he said there wasn't; that plaintiff called him a liar; that the bickering and quarreling continued all evening. The husband of the lady involved partially verified defendant's version of this incident.

In 1943 or 1944 defendant and his Moberly manager, Broggan, left Moberly for Glasgow to interview some prospective customers. Plaintiff, uninvited, got into the car and insisted on going with them. She immediately charged that defendant and Mr. Broggan were going to Glasgow to run around with a bunch of chippies. She was loud and angry, and defendant told her he would either have to quit the automobile business or leave her, if she persisted in such conduct. Broggan fully corroborated defendant's testimony as to this incident, and both he and defendant stated that the incident made them so nervous, and in such a state, that they did not attempt to contact their customers, but drove back to Moberly.

In the spring of 1943 defendant started to drive to Bucklin, accompanied by plaintiff. Plaintiff charged defendant with misconduct with other women, and attacked him physically. Defendant stated that she struck him in the face, scratched him so that his face bled, tore the right sleeve out of his shirt, practically tore his shirt off, and almost caused him to collide with another car. Defendant stopped the car, got out, and started walking back to Moberly when he was picked up by Mr. Baker, a friend, and transported to defendant's garage. Mr. Baker corroborated defendant's testimony in this regard, as did an employee who was at the garage when defendant arrived.

In 1944 plaintiff and three of defendant's women employees attended a meeting at Jefferson City. That night, in the presence of Dr. Maddox, plaintiff, in a loud angry manner, demanded that defendant discharge one of his employees, charging that she was a whore and that there was something between defendant and her. After they retired plaintiff continued her tirade and slapped him. He retired to another bedroom where she followed, he pushed her out, she came in again and he again pushed her out in the hall, where she slipped on a rug and fell. Two days later, he discharged said employee although she had done no wrong and was efficient.

He stated that, in 1948, plaintiff and defendant visited Mr. and Mrs. Gilstrap, at Washington, and were entertained in their home; that Mr. Gilstrap was a Macon County boy friend of defendant, a former secretary of a Congressman and a Senator; that next morning after arrival, Mr. Gilstrap invited plaintiff and defendant to a tour of the capitol, and to call on their friends; that plaintiff did not care to go but was in a rage when they returned, charging that defendant and Gilstrap had been whoremongering, to defendant's great embarrassment; that, thereafter, when Gilstrap visited defendant, at his home in Macon, plaintiff refused to speak to him, failed to provide any dinner, and left home shortly after his arrival. Mr. Gilstrap fully corroborated defendant's testimony as to both incidents.

Defendant stated that one Herman Teeter had been in his employ for many years but, in 1950, plaintiff charged that he was associating with undesirable women and demanded that he be discharged; that Teeter and his wife accompanied the parties to Indianapolis, to the auto races, and plaintiff treated them with discourtesy throughout the trip, virtually refusing to talk or to speak with either of them.

Defendant stated that plaintiff charged that one Harry Eaton, one of defendant's salesmen, was a liar and not a fit person to be employed, that both Eaton and defendant were liars. These charges were made in Mr. Fessler's presence, he being the Macon agency manager and, at defendant's request, Eaton was discharged. Fessler corroborated this testimony.

In 1950 these parties attended a social card party at the home of Mr. and Mrs. Fessler. The other guests were Capt. Pate and Trooper Davis, both of the state highway patrol, and their wives. During the evening defendant and Mrs. Davis were successful and won high score. Plaintiff flew into a rage, stormed, and charged that defendant and Mrs. Davis had cheated, that defendant would cheat for a dime, that he had always been a cheat, that both defendant and Mrs. Davis

cheated and that, if they denied it, they were liars.

Defendant stated that, at an Elks' dance, he and Mr. Gilbert, an insurance man, exchanged dances with their wives and Mr. Gilbert said to defendant, in plaintiff's presence, "Why don't you adopt me?" Plaintiff said: "What in the hell would he," meaning defendant, "want with you?" and, in Mr. Gilbert's hearing, told defendant that he was always associating with people below his standards.

According to defendant's testimony the incident that finally brought their relations to the breaking point occurred when defendant worked at his Macon garage until late the night of May 19, 1952, closing an important business deal. Defendant called, earlier during the evening, and told plaintiff that he would come home late. When he arrived home at 10:30 or 11:00 p. m., he found that he was locked out, but finally plaintiff let him in the house. She angrily charged him with having been out with women, said he didn't have any mind, that her former husband (from whom she was divorced) had a better mind than defendant; that he was silly; that he had been cut short on sex; that thereafter he could buy "his" and he would give her money to buy hers; that she would give him 15 days to straighten out. The next morning there was no breakfast for him, no lunch at noon and, at dinnertime, she asked him if he had seen his attorney. He immediately called his attorney for an appointment to bring a divorce suit but, because he was only recently out of hospital for an operation, he did not leave home until the following Saturday.

There was much more testimony concerning plaintiff's misconduct toward defendant, tending to humiliate and embarrass him in the presence of friends, employees, and associates, but the above is sufficient, if believed, to indicate that plaintiff was possessed of a grasping, and unreasonably jealous disposition, and of a violent and ungoverned temper, to which she permitted full rein upon the slightest or no provocation. The trial court believed the above testimony and we think that, in the main, it is true. The evidence is sufficient to justify granting defendant a decree of divorce.

True, the indignities continued over a long period of time but there was no condonation so as to bar defendant from a decree. Condonation means forgiveness and pardon on condition that the wrong will not be repeated. Robbins v. Robbins, Mo.App., 257 S.W.2d 92, 94. Here, plaintiff's conduct continued until the night of May 20, upon which occasion defendant called his lawyer for an appointment to institute a suit for divorce. Under these circumstances, condonation will not be inferred. Arnold v. Arnold, Mo., 222 S.W. 996, 999.

However, there was some evidence tending to prove that defendant maintained improper relations with another woman. If a party is guilty of such misconduct as to justify the other in having a divorce because of it, he is not an innocent and injured party and is not entitled to a decree of divorce, regardless of the other's misconduct. Bressie v. Bressie, Mo.App., 266 S.W.2d 24, 27; Dunlap v. Dunlap, Mo.App., 255 SW.2d 441, 442. The evidence in this case was not of this character; and the trial court so found.

We do not find the judgment to be erroneous. It is for the right party and should be affirmed.

BOUR, C., concurs.

PER CURIAM.

The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The judgment is affirmed.

CAVE, P. J., DEW, J., and WEIGHTMAN, S. P., concur.

BROADDUS, J., not sitting.