Jack TOOTLE, Plaintiff-Respondent,

v.

Winifred W. TOOTLE, Defendant-Appellant.

No. 22962.

Kansas City Court of Appeals.

Missouri.

Oct. 5, 1959.

Wm. Coleman Branton, Kansas City, Joseph K. Houts, St. Joseph, for appellant.

Strop & Strop, St. Joseph, for respondent.

BROADDUS, Judge.

This is an appeal by the defendant, Winifred W. Tootle, from a decree granting plaintiff, Jack Tootle, a divorce and the custody of the parties two children, a daughter born February 14, 1950, and a son born February 16, 1954, but granting defendant "reasonable rights of visitation."

Plaintiff filed his suit on January 15, 1958. He charged in his petition (a) that the defendant committed adultery since the marriage, and (b) that defendant had rendered indignities to him which included, among others, improper association with another man. He further charged that the defendant was unfit to assume and continue the proper control, care and custody of the minor children. Defendant's answer admitted the marriage of the parties, the jurisdictional residence of the plaintiff; the birth of the children, and denied all the charges against her made by the plaintiff, except the charge of adultery alleged in plaintiff's petition and except that part of the indignities charged against her that she had, during the marriage, improperly associated with another man.

Defendant's answer then asserted defenses of alleged condonation and recrimination and asserted a cross bill for divorce and custody of the minor children on the same charges set forth in her asserted defense of recrimination.

Defendant, in her pleadings, charged that plaintiff insisted that she habitually and continuously open their home to the plaintiff's mother and step-father; permitted constant visitation by them and required the defendant to take care of their needs; permitted his mother to arrange the furniture and furnishings of their home; that his love of his mother and step-father were his first consideration and concern; that plaintiff was unresponsive toward her and failed to show love and affection for her; that he permitted his mother and step-father to dominate and control his business and affairs and by acquiescing made plaintiff and defendant financially dependent upon his mother, step-father and grandfather; that because of such financial dependence upon his mother, step-father and grandfather, plaintiff insisted upon and directed her to comply with their wishes; that plaintiff was indifferent to her, her interests and welfare and did nothing to stop, but encouraged, the prolonged, unwarranted interference with the marriage, which was detrimental to her physical health and emotional stability.

The evidence disclosed that plaintiff was born Jack Tootle Young at Colorado Springs on December 21, 1917, the son of Otis G. Young and Katherine Tootle Young, who is the daughter of John J. Tootle. Plaintiff's father died when plaintiff was a baby. When plaintiff was seven or eight years old his mother married Stanley

Birdsall. Mr. Birdsall is now President of the Tootle Dry Goods Company of St. Joseph. Mr. and Mrs. Birdsall and the plaintiff moved to St. Joseph in 1928 and went to live at 802 Hall Street with plaintiff's grandfather, John J. Tootle, at which place the Birdsalls have ever since made their home. In 1939 plaintiff legally changed his name to Jack Tootle. He did this because of the years of past usage of that name extending back to the time he attended Culver Military Academy, Gulfport Military Academy and the Missouri University, at each of which places he went by the name of Jack Tootle.

The parties met at Mackinac Island, Michigan, where each of them had vacationed with their respective families during the summer months since childhood. They were married on June 30, 1945, at Grosse Point, Michigan, the home of the bride's mother. At that time Jack and Winifred Tootle were 27 and 19 years of age, respectively.

After their honeymoon, Jack and his bride came to St. Joseph and first stayed with Mr. and Mrs. Birdsall and John J. Tootle at the Hall Street address. Prior to his marriage Jack had purchased from his grandfather a small house located at 2401 Faraon Street. This house was purchased during the war period when housing was scarce. It was badly in need of repairs and was not ready for occupancy until December, 1945. The parties lived in this house about eight years. In December 1953, they moved into their new home at 2728 Francis Street.

After the Tootles moved to their new home, Dr. Wachter, a pediatrician, married and the father of three children, moved with his family to a home just two blocks away from the Tootle home. Defendant not only knew that Wachter was married, but also knew that he had three children. Because of Cerebral Palsy activities of Wachter and defendant's new-found interest therein, and because of close home proximity, and Wachter's association in treating the Tootle children professionally, close relationships developed between the families, starting in the winter of 1956, and continuing until Easter of 1957.

On the evening of that day the Tootles had guests in their home, among whom was Wachter. Happening to walk out into the dining room, plaintiff came upon his wife and Wachter embracing and kissing each other. When plaintiff returned to the living room the other guests could see that "he was quite upset about something." After the guests had departed, plaintiff discussed with his wife what had taken place and she told him that she was in love with Wachter. He then said to her: "If that is the case, 'you get him down here and we will talk this out.' She called him up and he came down." The three of them talked until possibly 3:30 or 4:00 o'clock in the morning when they finally concluded that Wachter and defendant "were not going to see each other, we were going to break off social relations as a family, he was going to stay away and so on."

One day during the first week of the following May the defendant suddenly announced that she had to go get some dresses fitted. This occurred "right during the noon hour" and plaintiff said "I didn't think that was where she was going." He knew that Wachter's normal lunch hour was from 12:30 to 1:30. This incident, coupled with the fact that defendant's attitude toward him had been "one of growing, increasing indifference, coldness, lack of cooperation", caused plaintiff to go to his friend, Mr. O. W. Watkins, Jr., a highly respected lawyer in St. Joseph, for advice. Mr. Watkins told plaintiff that he had a man in his office who was entirely trustworthy and that he would have him make an investigation.

There is no need to go into the details of this investigation because at the trial, which lasted five and one-half days, plaintiff proved that on June 18, 1957, the defendant had been guilty of adultery with Wachter in the bedroom of plaintiff's

home while the children were at home and even in the basement of plaintiff's home, during the daytime, and at night, while one or both of the children were there; also at least twice in the daytime in an automobile near Wathena, Kansas. This proof consisted of admissions defendant made in depositions introduced at the trial wherein she testified that she didn't remember how many times this occurred, either at home or near Wathena, Kansas. The transgressions of defendant were also proved by the testimony of defendant herself at the trial and by her counsel's admissions.

So we turn now to defendant's first contention: That "the court erred in granting a divorce to Jack Tootle, because he had knowledge of his wife's adulterous conduct and condoned the same and thereafter freely cohabited with her."

██ ██  Condonation is not an absolute, but is a conditional forgiveness of marital misconduct. It is an excuse for past offenses upon the express or implied condition that the marriage vows shall thereafter be duly regarded. It is not a license for subsequent and continued violation and if a breach of a condition inherent or expressed in the condonation takes place, the original grievances as causes of divorce are at once revived (Garton v. Garton, Mo.App., 246 S.W.2d 832, 838; Noll v. Noll, Mo.App., 277 S.W.2d 853, 856; Taylor v. Taylor, Mo.App., 224 S.W.2d 412; Wirthman v. Wirthman, 225 Mo. App. 692, 39 S.W.2d 404, 408).

██  In the Wirthman case, supra, this court stated:

"It has been held every condonation is upon the implied condition that the party forgiven will thereafter abstain from commission of like offenses and will treat the forgiving spouse, in all respects, with conjugal kindness. *It is not necessary that the subsequent injury be of the same kind, or proved with the same clearness, or be*

*sufficient of itself when proved, to warrant a separation or divorce. Accordingly, a course of unkind and cruel treatment will revive condoned adultery.*" Ratcliff v. Ratcliff, 221 Mo.App. 944, 949, 288 S.W. 794, and cases therein cited. (Italics supplied.)

After it had been reported to plaintiff that Wachter had been seen unclad in the bedroom of the Tootle home on the night of June 18, 1957, plaintiff left defendant and took the children to his parents home. He called defendant's mother in Detroit and so advised her. Defendant's mother and brother came to St. Joseph. A conference was arranged for June 23, the purpose of which was to bring about a reconciliation. Present at that conference were Jack and Winifred Tootle, Mr. Watkins and defendant's attorney. It was there agreed that (1) "There would be no association between the Tootles and Wachters or either of them", and (2) "Winnie and Jack from there on were going to lead an ideal marriage, they were to get along together, treat each other as they should, they were really going to start off anew."

██  After the reconciliation plaintiff treated defendant with kindness and affection, saying: "I wanted everything to be as wonderful as I could, we had our family back together, I did everything I knew how to do, sir." Defendant's mother stayed for about a week, and then the Tootles, on July 13 or 14, in the Birdsalls' car, went to Miltona, Minnesota, near Alexandria, on a two weeks vacation. While in Minnesota, but unknown to Jack Tootle, until her deposition was taken, after suit was filed, defendant admitted calling Wachter at his office in St. Joseph on a social call because she "wanted to talk to him." Mr. Tootle, while in Minnesota, discovered a letter which defendant admitted writing to Wachter. The letter dated "Tuesday", addressed "Dearest" and signed "God Bless you always, as Ever and Always" stated in part: "Oh, I wish I

could talk to you and have to be so careful writing, etc., mailing and everything to be sure. The days drag by very slowly—can't wait til Sunday. Please be home around 5 or at office. Will let ring once to let you know we are in and if and when could talk will ring once, twice. Have worried, thought, and wished for you more than I ever thought I would, so hope you are o. k. and happy. Hear everyone coming." The postscript dated "Thursday" stated: "No chance to mail this til today. Girls going to town shopping now so will be last note. All o. k. Hope so you same."

In the first week or two of September, 1957, the parties went to New York on a business trip leaving the children with Mrs. Nora Digenan. This was the last time that plaintiff had marital relations with defendant. They went to Detroit to see defendant's mother. Even thereafter defendant was not to be denied contact with Wachter. In November plaintiff found in the waste paper basket in his home Dr. Wachter's prescription pad containing the telephone number of the Children's Hospital in St. Louis. Although at the trial defendant testified that she did not call Wachter in St. Louis after June 1957, her deposition testimony was not so positive, and she admitted talking to him from St. Joseph when he was out of St. Joseph, and said she "may have" talked to him at the Children's Hospital in St. Louis, but she didn't remember where the calls were made or why. In November, 1957, defendant went alone to a Junior League meeting in Lincoln, Nebraska. She testified that she didn't remember whether she called Wachter from there.

Defendant constantly exerted pressure on plaintiff to see the Wachters and over plaintiff's objections insisted that Wachter treat the children. During this same period defendant continued to go to Cerebral Palsy meetings where Wachter would be present. She sat next to Wachter at a meeting at the Maple's Tea Room where a large number of people were present. At a Christmas, 1957, nursery school party she and Wachter were seen "sitting in a corner in a rather deep conversation."

On Christmas Eve, 1957, the Birdsalls were invited to the Tootle home, and that night, which defendant admitted was a sacred time, and after the tree had been decorated for the children, defendant wore Wachter's ring to bed. This ring had been admittedly given to her by Wachter and had secretly been kept from her husband. She had not returned the ring at the time her deposition was taken, *nor had she done so at the time of the trial.*

Visitors in the Tootle home during the fall of 1957 and up until the time of the final separation testified that defendant was cold and indifferent to plaintiff; let him shift for himself when he was ill; "ignored him"; "refused to speak to him"; was "hostile and antagonistic" toward him. As one of these witnesses stated "by the time of early January she was progressively more hostile."

In view of the above facts, it is clear that the defense of condonation is not available to defendant.

Defendant next contends that plaintiff was not an innocent and injured party and for that reason was not entitled to a divorce. The basis for this contention is her claim of "Birdsall interference" with the marriage.

There was a close, healthy relationship between defendant and Mr. and Mrs. Birdsall. Mrs. Birdsall said: "I thought we got along. I loved Winnie as if she was my own daughter; to me she was a lovely daughter-in-law. And Mr. Birdsall said: "We were devoted to her."

Mr. Birdsall helped repair the Faraon Street house, such as painting, fixing storm windows, building cabinets, sealing doors, etc. Mrs. Birdsall helped with the decorations and furnishings. In December, 1953, the Tootles moved into their new home on Francis Street. "It was the one house in

town that she (defendant) wanted." The Birdsalls loaned Jack and Winifred the $10,000 down payment for the purchase of this new home, upon which $7,600 was repaid when their Faraon Street home was sold. The Birdsalls gave them things for both the old and new homes, helped care for the defendant when she was ill, purchased clothes for the children, and for defendant, and bought them a new model Triumph sports car. Mr. Birdsall made play things for the children. He built a doll house for the little girl and, at defendant's insistence, finished it and gave it to Kathy as late as Christmas, 1957. He took the children to a sandwich shop for Saturday morning breakfasts as a fun activity.

Grandfather Tootle gave the couple a Cadillac car as a wedding present. Defendant helped pick out the color and body style. He gave them memberships each year in the St. Joseph Country Club and in the Benton Club. They used the facilities of these clubs for parties and other activities. Without objection from defendant, he gave a cyclone fence for the yard at 2728 Francis Street in order to protect the children. He and the Birdsalls made summer vacations at his home on Mackinac Island possible. He gave Christmas and other gifts, and money, to Winifred, Jack and the children. Each year he gave Jack $3,000.

Mrs. Birdsall testified that, "I never knew her (defendant) to object to anything that we gave her", and "she has given me a great many gifts, almost more than I can enumerate." Both Mr. and Mrs. Birsdall testified that there never was a time that they realized that they were in the Tootle home "without Winnie's invitation or consent."

Plaintiff testified that his wife exercised her own choice in the home furnishings, colors, wall paper, etc., "she wanted organdy curtains, she had organdy curtains. I think both of us were in complete agreement in the color of the dining room, the living room, and we had a very bright yellow one * * *." That defendant did so exercise her choice on decorations, furniture and house improvements, was further confirmed by Mrs. Birdsall.

The facts are that the first claims of so called "Birdsall interference" were made to Jack Tootle only after the Minnesota trip of late July, 1957, and the first claims of such alleged interference were made directly to the Birdsalls at the earliest in late September or early October, 1957. The record justifies the following statement contained in plaintiff's able brief: "She (defendant) alone conveniently changes kindness and help to interference; friendship to domination; gifts to financial dependence; display of parental affection to lewdness; grandparents love of grandchildren to over-possessiveness and over-indulgence."

The record is clear so far as any immorality by Jack Tootle is concerned. He is a religious man, is intelligent and industrious. He did everything he knew how to preserve his marriage and family, and to build a home for his children. Until the Wachter episodes he had a perfect understanding with his wife. He put his money in the family till for family purposes, and was good about giving his earned money to Mrs. Tootle for the family. He did not require his wife to open the home to his step-father and mother, nor take sides with his parents against his wife. He never struck his wife or abused her physically. Without doubt, he was the innocent and injured party and the court did not err in so holding.

Defendant's final contention is that the trial court erred in awarding the custody of the children to the plaintiff.

There is no absolute rule by which it can be determined which of the two contesting parents is entitled to the custody of a child upon their separation, but each case must be judged on its own facts "and in determining where the custody of a child shall go, the acts and attitude

of the parents toward each other, the causes leading to the divorce, their treatment of each other, and similar matters, are all material and admissible in evidence as bearing upon the question of the fitness of the respective parents to have the custody of their child." Meredith v. Krauthoff, 191 Mo.App. 149, loc. cit. 170, 177 S. W. 1112, loc. cit. 1120. If anyone asserts that the question has not been a difficult one for the courts, let him but read the graphic language which appears in the opening paragraph of the much cited Krauthoff case. Usually the custody of children is awarded to the party who prevails in the divorce action. Wells v. Wells, Mo.App., 117 S.W.2d 700; Wilson v. Wilson, Mo.App., 260 S.W. 2d 770, 776. Our courts have said that "all things being equal", a child of tender years should be given into the custody of the mother. Keith v. Keith, Mo.App., 95 S.W. 2d 669, 672. But the "guiding star" which the courts must follow in determining the question of custody is the welfare and best interests of the child. There is an additional well settled rule "that the findings of the trial court in matters involving the custody of a minor child of divorced parents, while not binding upon the appellate court which must review the record for itself, are nevertheless not to be lightly disturbed, and will be deferred to unless the appellate court is firmly convinced that the welfare of the child requires some other disposition." Lutker v. Lutker, Mo.App., 230 S. W.2d 177, 179.

In the case of Ragan v. Ragan, Mo.App., 315 S.W.2d 142, 147, the court observed: "There is no paucity of cases demonstrating that, where the best interests of a child will be served thereby, custody will be awarded to the father;" and listed many cases in a footnote.

In the case of Manville v. Manville, Mo. App., 81 S.W.2d 382, this court reversed the finding of the trial court and held, that because of the wife's adultery, custody of a two-year old daughter should be awarded to the husband. And in the case of Goodin v. Goodin, Mo.App., 5 S.W.2d 697, the St. Louis Court of Appeals upheld the judgment of the trial court which had granted the husband a divorce from the wife on the grounds of adultery, and had given him the custody of the child born of the marriage, a girl 3 years old at the time of the divorce.

In the instant case plaintiff is the innocent party. No act of his brought about this tragedy. He has good moral character and a fine reputation as a respected, capable business man and a good father. He loves his children, spends much time with them, and they love him. He lives in a new Crestview Village apartment which is located in the nicest residential district. It has a large living room, dining room combination, with three bedrooms. There is a playground and there are many children. The apartment is well furnished with separate rooms for each of the children. He has made arrangements with Nora Digenan to care for the children while he works. Nora Digenan, herself the mother of 7 adult children, was the oldest of a family of 10 children and has been caring for children since she was 16 years old. She is 59 years of age and not in bad health as defendant asserts. She helped when the Tootle children were born and has been closely associated with them all their lives. She had been the only Tootle baby sitter, until December, 1957. She had worked caring for the children every Saturday night, and on Mondays at first, and later on Wednesdays, stayed when the defendant was alone, and when the Tootles were away. She took care of the children even after suit was filed in 1958, when defendant was in the hospital. She vacationed with the Tootles at defendant's family home in Detroit, and was asked to go to Minnesota by both Jack and Winifred Tootle. In fact, Winifred Tootle asked her to do all these things more than Jack Tootle. She loves the children as she would her own and wants to take care of them and they love her too. Certainly in

this new home which plaintiff has established physical and emotional security for the children in a proper and religious environment filled with love, devotion and concern is assured. It would not be "in the nature of an experiment" which our courts refuse to sanction. Stricklin v. Richters, Mo.App., 256 S.W.2d 53, 57.

Defendant relies heavily upon the holding of this court in the recent case of Paxton v. Paxton, Mo.App., 319 S.W.2d 280. In that case all of Mrs. Paxton's immoral activities were committed away from home and away from the children. Adultery is adultery but, adultery committed in the husband's home when the children are there, as was done in the instant case, is not only adultery but is a moral abandonment of the sanctity of the home and a complete abandonment of the children. There are other crowning fact differences between the Paxton case and the instant case. The oldest of the Paxton children expressed herself openly against the father and in favor of the mother. This child was afraid of her father, and said her mother showed more interest in all of the children. Mr. Paxton was away a great deal of the time; he refused to assist and associate with the children; by his own admission he struck his wife; he took his wife to a house of ill repute in Cuba; he admitted, but sought to explain away, associations with other women in Kansas City, in Albuquerque, New Mexico, and Las Vegas, Nevada. Mr. Paxton's wife testified that in addition, he used vile and profane language, ridiculed religious training; tried to run her down with an automobile and attempted also on two occasions to kill her. Thus the facts distinguish the Paxton opinion from the instant case.

We are not inclined to disturb the finding of the learned trial court. The judgment is, therefore, affirmed.

All concur.