CARL WILLIAM POOR, RESPONDENT, v. RUTH POOR, APPELLANT.— 167 S. W. (2d) 471.

Springfield Court of Appeals. December 21, 1942.

Rehearing denied January 13, 1943.

*Royle Ellis* and *James E. Sater* for appellant.

746

*D. H. Kemp* and *H. A. Gardner* for respondent.

FULBRIGHT, J.—This is an action to modify a divorce decree rendered in Barry County, March 25, 1936, with respect to the care and custody of minor children and property settlement made with the wife and approved by the court. Judgment for plaintiff (respondent) and defendant appeals.

The respondent, Carl W. Poor, filed suit for divorce against Ruth Poor in the Barry County Circuit Court, returnable to the March Term, 1936. Appellant filed her answer and cross bill.

There were two children by the marriage, Carl William, Jr. and James Wallace, being six years of age and eleven months of age, respectively, at the time the divorce was granted.

Prior to the granting of the divorce, respondent and appellant entered into the following written contract:

"It is hereby stipulated and agreed by and between the plaintiff and the defendant in the above entitled cause as follows:·

"That if the circuit court shall find the issues in favor of the defendant upon her answer and cross bill filed in this cause, the decree and judgment shall adjudge the property rights in gross as follows:

"(a) Defendant shall have the care and custody of the minor children, the plaintiff given the right and privilege of visiting and looking after said children at all reasonable hours.

"(b) Plaintiff to pay to defendant for her support and that of their minor children the sum of $100.00 per month, said sum to be paid on or before the 10th day of each and every month, but in the event that defendant should remarry, plaintiff is to pay the sum of $50.00 per month for the support of the children, said amount subject to review by either party in the court.

"(c) Plaintiff to convey to defendant, Ruth Poor, by general warranty deed, 2½ acres being a part of SE SE in Section 28, Township 24, Range 29, Barry County, Missouri, subject to an encumbrance of $1500 payable in monthly installments; plaintiff agreeing to pay the monthly payments for the next ensuing 18 months from this date, the balance defendant assumes and agrees to pay.

"(d) Plaintiff further agrees to hold the defendant harmless by reason of any and all notes she has up to this date signed with the plaintiff and others, except the note described in paragraph "c".

748

"(e) Defendant to have all household and kitchen furniture and fixtures in the home now occupied by defendant.

"(f) Plaintiff agrees to pay all court costs including defendant's attorney fees."

Upon a hearing, Ruth Poor, the appellant herein was granted a decree of divorce, together with the care and custody of the two minor children, which said decree is in words and figures as follows:

"Now on this day this cause coming on to be heard the plaintiff appears in his own proper person and by attorney, D. H. Kemp, and the defendant appears in her own proper person and by her attorneys, James E. Sater and Royal Ellis, the defendant having filed her answer and cross-complaint, and the plaintiff having withdrawn his charges, the cause and matter is submitted to the Court for hearing, the Court after hearing the evidence and all things being fully seen and understood and being fully advised in the premises the Court finds that the defendant is the innocent and injured party and is entitled to the relief prayed for in her answer and cross-complaint, and doth order that she be and is hereby absolutely divorced from the bounds of matrimony contracted with plaintiff, and that she be and is hereby restored to all the rights and privileges of an unmarried person, and that she have the care and custody of the two minor children, Carl William Poor, Jr., and James Wallace Poor, mentioned in the petition and answer and cross-bill, and that plaintiff be given the right to visit said children at all reasonable times and places.

"It is further ordered and decreed by the Court that the property rights in gross are adjudged that plaintiff pay to defendant for her maintenance and that of said minor children the sum of $100 per month, to be paid on or before the 10th day of each and every month hereafter, so long as defendant has the care and custody of said minor children or until defendant remarries, but that if defendant does remarry in the future, then in that event plaintiff is to pay to defendant the sum of $50 per month for the maintenance of said minor children on or before the 10th day of each and every month, said amounts subject to review by either "party in court, and that if any of said monthly allowances are not paid on or before the 10th day of each and every month that execution may issue therefor.

"It is further ordered and decreed by the Court that plaintiff convey by warranty deed to defendant the following described real estate situate in the County of Barry, State of Missouri, to-wit: Part of the Southeast Quarter of the Southeast Quarter, Section 28, Township 24, Range 29, containing 2½ acres, subject to an encumbrance of $1500.00, payable in monthly installments, and that plaintiff is ordered to pay said monthly installments for the next ensuing 18 months from this date, and that defendant pay the remaining installments upon said encumbrance.

"It is further ordered and decreed that defendant is to have all the household and kitchen furniture and equipment in the home now occupied by defendant.

"It is further ordered and decreed that plaintiff is to hold defendant harmless from any and all notes or obligations that she may have signed with plaintiff, except the balance of the encumbrance on $2\frac{1}{2}$ acres of lands herein described.

"It is further ordered and decreed that plaintiff is to pay all the costs of this court including attorney fee for defendant in the sum of $100, that execution may issue therefor, that the above finding and adjudications of property rights are in gross, being entered into as per stipulation filed herein, and signed by both plaintiff and defendant."

In September, 1941, the respondent herein filed a motion to modify the decree heretofore rendered, and asked that the care and custody of the children be awarded to him and that he be relieved of the payment of the said $50 a month or any other amount to appellant. He alleged in substance that the children have lived under unfavorable and baneful influences and improper surroundings and conditions; that neither of said children have been taught responsibility or obedience; that they are subjected to and compelled to live in the presence of violent outbursts of emotion, vulgar and indecent language in said home; that said children have been neglected and entrusted to appellant's parents, and have been taught to disrespect him; that appellant has refused to let him see the children alone or take them places for entertainment; that he has been subjected to humiliation and abuse upon his visits to see the children.

In reply to said motion appellant filed an answer in which she denied each and every allegation therein alleged. The answer then alleged that she properly cared for the children, furnished them with a home, with good moral influences and gave them proper training, religious and otherwise. She further pleaded the contract entered into between herself and respondent, wherein the amount to be paid to her was fixed by contract and alleged that the court was without jurisdiction to change or modify the terms of the contract touching the payments to her.

Upon a trial the court awarded the custody of Carl William Poor, Jr., now 11 years old, to respondent; the custody of James Wallace Poor, now six years old to appellant, together with $35 per month for his support; cancelled the monthly payments of $50 to Ruth Poor; ordered that Carl W. Poor, Jr., be permitted to visit in the home of his mother one week-end each month and for a period of two weeks during school vacation, and that James Wallace Poor be permitted to visit in the home of his father one week-end each month and for a period of two weeks during school vacation, the father to take the children to and from the homes on such visits.

Appellant contends, first, that the stipulation and agreement heretofore set out was a complete settlement of their property rights and that the court had no jurisdiction to modify its former decree with respect thereto; and, second, that the facts do not warrant a modification of the decree, either as to alimony or as to the care and custody of the children.

In disposing of the first contention we are faced with the responsibility of construing paragraph "b" of the contract as heretofore set out. By reading said paragraph in its entirety it is clearly and definitely apparent that the purpose and intent of the contracting parties was, that of the $100 per month mentioned therein the appellant should receive $50 for herself and $50 for the support of the children. No other reasonable construction could be placed thereon. The concluding sentence in said paragraph which reads as follows, ". . . but in the event that defendant should re-marry plaintiff is to pay the sum of $50 per month for the support of the children, said amount subject to review by either party in the court", is clear and unambiguous. The words, "said amount subject to review" unmistakably refers to the $50 per month provided for the support of the children.

It is quite true that if the $50 monthly payment provided in said contract and approved by the court in its divorce decree is an award of alimony, it is subject to modification; but if it is a legal contractual obligation of the respondent, the court is without jurisdiction to modify same. The contract seems to be plain and unambiguous. There is nothing to indicate that it is the result of fraud or collusion, and the legal obligation of the respondent to support his wife while the marital relationship existed and the duty imposed upon him to support and maintain her in case of a separation and divorce, is a sufficient consideration for the contract.

It purports to have been executed and filed with the court on the day the divorce was granted. The decree follows its provisions in substance, and closes with the following language: ". . . that the above finding and adjudication of property rights are in gross being entered into as per stipulation filed herein, and signed by both plaintiff and defendant."

It is obvious that an award of monthly alimony to a divorced wife until she re-marries might prolong the payments beyond the death of the husband, and since monthly alimony does not survive the death of the husband the award in the instant case does not partake of the nature of alimony.

It is our conclusion that the contract in the case at bar is binding on the parties; that the provision in the decree providing for the payment of $50 per month to the wife until she re-marries, "justifies the conclusion that the decree was an approval of the contract, and not an award of alimony, because the court had no authority to make an award of alimony to continue so long as the wife remained single

and unmarried, but did have authority to approve a contract between the parties containing that provision.'' [North v. North, 100 S. W. (2d) 582; Bishop v. Bishop, 162 S. W. (2d) 332.]

Moreover, the mutual agreement as to the settlement of the property rights in gross as embodied in the decree must be viewed as having been found by the court to be valid and binding; that it was a fair settlement under all the facts and circumstances, that it was legal for the husband to consent to such a decree, and having done so it is binding upon both parties. He voluntarily consented to the provisions thereof and is not now entitled to relief. [Landau v. Landau, 71 S. W. (2d) 49.]

We shall now direct our attention to appellant's second complaint. Cases such as the one at bar are tried *de novo* on appeal as in an equitable proceeding, and we are therefore required to review the entire record. The improper testimony that may have been admitted will be disregarded and we shall render such judgment as we think the pleadings and evidence warrant. [Wells v. Wells, 117 S. W. (2d) 700.] Since there was testimony improperly admitted and certain proceedings had which cannot be approved and which we shall disregard in reaching our conclusions, it is well that we identify the testimony and the proceedings which we exclude.

It appears that the girl, Bernice, spoken of hereafter, is an afflicted sister of appellant, about 25 years of age and who lives in the home where the little boys reside.

While witness Emerson Barnett was on the witness stand the following question, among others, was asked:

''Q. What do you know, if anything, about this Bernice and Billy, this oldest boy, taking their clothes off out in the back yard about a pool? A. Well, Billy came over to the station, and I was over there working and he told me—

''By Mr. Ellis: Objection as to what he told you.

''By The Court: Overruled at this time.''

To which action of the Court in overruling said objection so offered on the part of the defendant, the defendant in open court, by counsel, objected and excepted at the time.

''A. Billy said he would tell me something if I wouldn't tell it to anybody.''

Then follows the story which the little boy is purported to have told him and which would not be appropriate to set out here.

While Dr. Poor was on the witness stand the following occurred:

''I heard Mr. Barnett testify this morning about what Billy told him about him and this girl. I heard it from Billy.

''Q. What did he tell you?

''By Mr. Sater: I object to that.

''By The Court: Overruled.

''Exception was duly saved and the doctor answered the question.

"A. He told me the very same story that Mr. Barnett told here this morning. . . ."

Witness further stated that the boy Billy was 8 years old at the time. Subsequently, this proceeding occurred:

"By MR. GARDNER: Your Honor, I understand that this little boy hasn't been here. We sent for him and I understand that he is here. The Sheriff is here. I suggest—he is only eleven years old and I doubt whether he ought to be made a witness, but I am going to suggest that if the Court cares to talk to him we would be glad to have him do that and we want to make it a part of the record. . . ."

In respondent's additional abstract the following appears:

"At this point Mr. Gardner suggested that the Court interview the boy as set out on page 57 of appellant's abstract of the record; and thereupon the Court did interview said child in chambers."

The testimony of Barnett and Dr. Poor above referred to was purely hearsay and was wrongfully admitted. There is nothing in the record to indicate that appellant consented to the interview of the boy in chambers, and neither appellant nor her counsel were present. As to what the boy stated in this interview the record is silent.

Shorn of this testimony, which we deem to have been improperly admitted, there is little left in the record upon which the court could have based his finding.

Respondent offered thirteen witnesses, other than himself, several of whom were intimately acquainted with both appellant and respondent and the Chenoweths, in whose home the appellant and the two boys resided, and all of whom spoke in the highest terms of the homelife and the moral standing of each of them. Not a word fell from the lips of any of respondent's witnesses that cast the slightest reflection upon appellant, the children, Mr. and Mrs. Chenoweth or the home in which they lived, aside from the witness Barnett, who testified to one occasion near Christmas time when Dr. Poor came to the Chenoweth home to visit his children. Upon leaving he heard Ruth Poor, the appellant, tell respondent to never come back and saw Mrs. Chenoweth, the mother-in-law, waving her hands and go out to the doctor's car and put something in it, presumably toys the doctor had brought to the children; that when the doctor came out of the Chenoweth home his hat was all crushed in.

The doctor testified at length as to what occurred upon this occasion and said that on visits to see the children he was treated with disrespect, embarrassed and humiliated, although he had never been refused admission to the house. He said: "I think they let me in so they could pounce on me after I got there. Ruth would usually start when I got in. The first thing I got was bemeaning and name-calling and then would come mother floating into the room, and I have taken everything that a man was subject to in order to see my boys. I couldn't remember all the occasions because there has been dozens of them. A few of the outstanding ones that I can recall more

vividly was the time Mr. Barnett told about the grandmother taking the toys and throwing them back into the car. . . . I think it was Christmas day. . . . I had the audacity to bring my own boys presents . . . and when the boys were unwrapping their presents, their grandmother comes in and insists they be thrown in the fire. The boys were crying and hollowing . . . and Ruth restrained her mother so she didn't get to throw them in the fire place, and she rushed out the door and threw them in the back seat of my car. I stayed a few minutes and listened until I couldn't listen no longer. Then I started out . . . I was sitting on the divan and one of the boys was on one side and the other boy on the other side and she came just raving and she was calling me every kind of name she could think of. I just looked up and smiled at her. It was ridiculous, and there was no reason why she should do that. She hauled off to take a haymaker at me. She hauled off to hit me. She didn't hit me; just caved my hat in. I said, 'Now listen, I don't care what you say, but you keep your filthy hands off of me.' Mr. Chenoweth appeared on the scene and tried to quiet her down. . . . The only cause for her outburst is that I had divorced the mother. I hadn't said or done anything. . . . It was a very great complaint that I had re-married.''

It will be observed that the doctor re-married about a year after he secured his divorce; that he married a nurse who had been working in his hospital at the time the divorce was granted.

Mrs. Chenoweth gave this version of what happened when the doctor brought the toys to the children: ''Doctor Poor brought the gifts down to the children, more than we could keep. I thought he ought to help raise those children and I said that the Bible says that anyone should not put anything in the way of raising these little boys. He gave me the horse laugh and said he wasn't making fun of the Bible. I said, 'I have never done no harm to you except I am just trying to raise your dear little boys and since you have married this woman you had better stay away', and he began crying and said he could not stay away. I have always treated him as courteous as I have known how. . . . There was no objection on my part to him coming and visiting the children.''

On cross-examination the following appeared: ''Q. Where did this conversation take place when you proceeded to tell Doctor Poor where to head in? A. That was just in the living room and that was just one time. I was always happy to be friends with him. Ruth wasn't there when he came. My father was there. He seemed very glad to talk. I didn't mash his hat down. I did not go out on the porch and shake my fists and wave my hands. . . . Q. When Doctor Poor would come over to see these children he came to see the children? A. I assumed he wanted to be with Ruth. He always wanted her to go sit in the car. He always wanted to see Ruth. I don't know whether he came to visit her.''

Excepting this one incident, which seems to have occurred immediately following his re-marriage, Mrs. Chenoweth testified there were no controversies when respondent came to visit the children.

Appellant, Ruth Poor testified: ''I have had no objections to him coming and visiting them. It isn't true that upon his visits to his boys that I have fussed, nagged and used abusive language toward him. I never abused him in any way when he would come to see these boys. I have taught them to love and respect their father. I have done the very best I could.''

On August 9, 1937, respondent wrote appellant a letter which indicates that they were on very friendly terms and that the best of relations existed between them. It was in part: ''Dear Ruth: Was down to see kids for a little while yesterday P. M. . . . . The boys are getting along fine. Jack thought they were grand. I told him all about it and that we are going to get back together soon.'' This letter was written shortly after the doctor's marriage to the nurse.

The many witnesses offered by respondent testified that he had an ideal home; that he possessed high ideals with respect to morality and citizenship; that the conditions in his home were congenial and happy; that his present wife, with whom he lives together with their child, was a compatible and pleasant woman; that the doctor seldom took a drink, although he sometimes had liquor in his home and served highballs to visitors; that his wife sometimes drank and smoked, but not to excess. The home in which they live is a modern home on a ten-acre tract and all agreed that his homelife, the home and surroundings would be a satisfactory place in which to rear the two boys. The doctor is in a much better financial condition now than at the time the divorce was granted, has a very lucrative practice, is a very busy man and capable of taking care of the boys in an appropriate manner.

Respondent also brings out in his testimony that Bernice, heretofore referred to, is afflicted with dementia precox, which in her case is defined as meaning a split personality; that the condition developed when she was about seventeen years of age; that at first she was extremely nervous and later developed a mania for going in the nude and conducting herself in such an immoral way as to have a demoralizing influence upon the two boys.

Appellant admits that her sister is afflicted and is shown that she has been taken to various places for treatment in order to have her health restored. It is further shown that she has improved in the last few years and is still improving. She is now attending church and Sunday school regularly and is an accomplished musician. The many witnesses who testified on behalf of appellant had never seen or heard of any acts of immorality or any other improper conduct on the part of Bernice, but spoke of her as having a splendid reputation. Nor was there any evidence offered by respondent that cast the slightest reflection upon her other than respondent and witness

Barnett. It is specifically denied by Mr. and Mrs. Chenoweth and appellant that she had been guilty of any misconduct in or about the home.

Moreover, the trial court obviously was not impressed with the charges in this respect, otherwise he would not have awarded the custody of the younger son to appellant knowing that he would remain in the Chenoweth home where he has resided a greater part of the time since the divorce was granted to the mother.

Appellant offered fourteen witnesses, other than herself, all of whom spoke in the highest terms of the moral character of appellant and her children, as well as Mr. and Mrs. Chenoweth; that the children are well cared for and apparently want for nothing; that they are surrounded by the best christian influences. According to the teachers the children are getting along excellently in school. They attend church and Sunday school regularly, and the older boy has recently joined the church. There is no evidence of any misconduct in any manner of appellant or her parents, and no criticism of the homelife.

Many of these witnesses spoke very highly of Doctor Poor and his moral and professional character and not a word of criticism is directed at him except by appellant.

There is no evidence that there has been a changed condition financially or otherwise so far as appellant is concerned since the settlement of their property rights and the granting of the divorce decree in which she was awarded the custody of the children.

In the home in which appellant and the children reside are Mr. and Mrs. Chenoweth, their daughter, Bernice, and Mrs. Chenoweth's father. It is a nine-room house, one of the best in Wheaton, and ample to accommodate all who reside there in a very satisfactory and convenient manner. The acreage upon which the house stands furnishes ample play ground for the boys and other children visit and play with them there. They also have a den in the home in which they keep their toys and do their studying.

The important question with which this court is concerned is the welfare of these two little boys. In such a situation we usually defer to the finding of the trial court because of the superior advantages for weighing the evidence and judging the credibility of the witnesses, especially where the witnesses testified orally and the evidence is conflicting. But the findings of the lower court are not binding upon this court. [Wyrick v. Wyrick, 162 Mo. App. 723; Everts v. Everts, 79 S. W. (2d) 536.]

While it is true Carl William Poor, Jr., is now about twelve years of age, and reaching the period in life when he needs the advice of a father, and that there is a strong attachment existing between Doctor Poor and the children, especially the older boy, nevertheless we cannot sacrifice the interests of either of the children. It is always a tragedy in the life of a child when its parents are divorced. It is the children who suffer the bitter fruits of their folly. This has

been the lot of Carl William and James Wallace and another tragedy should not be injected into their lives by separating them. As said in the case of Fisher v. Fisher (Mo. App.), 207 S. W. 261, we are clear in the view that these boys should grow up in the same household "and be permitted to share in common their childish joys and sorrows and have the fullest benefit of these natural ties of affection and interest, which, as the offspring of the same parents they are intended by nature to enjoy and which they would have enjoyed had it not been for the unfortunate circumstances which brought about the permanent separation of their father and mother." [Abel v. Ingram, 223 Mo. App. 1087, 24 S. W. (2d) 1048; Tuter v. Tuter, 120 S. W. (2d) 203; Wells v. Wells, *supra*.]

In the instant case the appellant was granted a divorce from respondent on her answer and cross bill and the care and custody of the minor children were awarded to her. Respondent was adjudged to be the guilty party and appellant herein was adjudged to be the innocent and injured party. In this situation it is the legal duty of the husband to provide for his divorced wife during their joint lives or so long as he is financially able. The State has a vital interest in having a safe and secure provision for the maintenance of the wife, the obligation for which has arisen from the default in the marital relations. [Bowzer v. Bowzer, 155 S. W. (2d) 530; Stark v. Stark, 115 Mo. App. 436.]

It is our conclusion that it is not to the best interest and welfare that these children be separated at this time; and that there is not sufficient change in the conditions of the parties, financially or otherwise, to warrant the court changing the original decree, except as to the rights of visitation. [Rone v. Rone, 20 S. W. (2d) 545; Lampe v. Lampe, 28 S. W. (2d) 414; Eakins v. Eakins, 162 S. W. (2d) 87.]

The judgment of the trial court is therefore set aside and the cause remanded with directions that the original decree, which was rendered at the time the divorce was granted, be modified only to the extent of permitting respondent to visit his sons, Carl William Poor, Jr., and James Wallace Poor, in their home once a month at such times as are reasonable; and that said sons be permitted to visit the father in his home one week-end each month during the school term and for a period of at least two weeks during summer vacation, the father to call for and return said children on such occasions. *Blair, P. J.,* and *Smith, J.,* concur.