**Ardys Marie DAVIS, Plaintiff-Appellant,**

v.

**Harry Anderson DAVIS, Defendant-Respondent.**

No. 7964.

Springfield Court of Appeals.

Missouri.

Feb. 17, 1962.

Kearby & Calvin, Poplar Bluff, for plaintiff-appellant.

Roy W. McGhee, Jr., Piedmont, for defendant-respondent.

STONE, Presiding Judge.

This appeal brings before us another broken home involving not only abandonment by the parents of their marital vows to love, honor and cherish each other "till death do us part" but also disposition of their two innocent children whose custody is the sole remaining subject of dispute between the parents. Plaintiff Ardys instituted this action by the filing of her petition on January 21, 1960, in which she sought a divorce for alleged indignities [Sec. 452.010],[1] custody of the two minor children, and monetary allowances for alimony, attorney's fee and child support. Defendant Harry countered with a cross-bill in which he sought the divorce, likewise for

1. All references to rules are to Supreme Court Rules, V.A.M.R., and all references to statutes are to RSMo 1959, V.A.M.S.

alleged indignities, and custody of the two children. Following trial on July 8, 1960, the court granted Ardys a divorce and attorney's fee but no alimony, awarded care and custody of both children to Harry "during the months of September through May of each year" and to Ardys "during the months of June through August of each year," and directed Harry to pay $80 per month child support during the months of June through August. No motion for new trial was filed by either party, and no appeal was taken in regular course. Rule 82.04; Sec. 512.050. Almost five and one-half months after judgment, towit, on December 20, 1960, Ardys (then represented by other counsel) sought a special order of this court allowing her to appeal under Rule 82.07. Also Sec. 512.060. Upon her sworn motion which cast the blame upon her trial counsel for failure to perfect an appeal in regular course and which contained numerous blunt and persuasive representations as to what the record would show (many of which were either unwarranted or exaggerated, as the subsequently-prepared transcript demonstrates), we granted the requested special order and Ardys' notice of appeal was filed on January 5, 1961. Rule 82.07; Sec. 512.060.

Ardys married Harry on October 9, 1947, in Piedmont, Missouri. Their final separation was on December 12, 1959. During the interim, their conjugal course was interrupted by a prior divorce and remarriage and was punctuated by several separations. Ardys uncertainly hazarded an estimate of "two or three other" separations but volunteered that "I could be wrong" and suggested that "you could ask Harry," while Harry, perhaps with a trace of bitterness, thought that "when I lost track it was around twelve times and there have been a few since then." Of this fitful and intermittent union, the first child, David Eugene, was born on August 12, 1949, and the second, James Andrew, was born on August 9, 1955 (after the first divorce and remarriage), so the children are now about 12½ and 6½ years of age, respectively.

Ardys, the appealing party, presents only two "points" in her brief, towit, (1) "the trial court's findings that plaintiff was the innocent and injured party and that the minor children were of tenders (sic) years entitled plaintiff to the custody of said children" and (2) "all things being equal in divorce suits custody of children must be granted to the wife, especially if they are young children." There being no *express* findings in the judgment and decree nisi, Ardys' first point obviously contemplates and depends upon the *implied* finding, inherent in and essential to any such general decree, that the party to whom the divorce is granted must have shown himself or herself (as the case may be) to have been the innocent and injured party. Simon v. Simon, Mo., 248 S.W.2d 560, 562(1); Freebairn v. Freebairn, Mo.App., 349 S.W.2d 486, 487(3); McCoy v. Briegel, Mo.App., 305 S.W.2d 29, 35(9). But, to have concluded that Ardys was "innocent" (within the meaning of that term as employed in divorce cases), the trial court was required to find no more than that her conduct would not have entitled Harry to a divorce on his cross-bill, so no more than that is necessarily inherent in the implied finding of Ardys' innocence [Elgin v. Elgin, Mo.App., 301 S.W.2d 869, 872(3); Cadenhead v. Cadenhead, Mo.App., 265 S.W.2d 426, 436 (6); Dunlap v. Dunlap, Mo.App., 255 S.W. 2d 441, 442(1); Politte v. Politte, Mo.App., 230 S.W.2d 142, 148; Rowland v. Rowland, Mo.App., 227 S.W.2d 478, 484(3)]; and, in determining custody of the minor children, Ardys' success in obtaining the divorce was not in the trial court, and is not here, a decisive and controlling factor. L—— v. N——, Mo.App., 326 S.W.2d 751, 754(3); Paxton v. Paxton, Mo.App., 319 S.W.2d 280, 288(10); McKenzie v. McKenzie, Mo.App., 306 S.W.2d 588, 591(3) For that matter, the transcript on appeal leaves us in grave doubt as to whether Ardys was the innocent and injured party and as to whether she should have had the decree; but, with no appeal by Harry and with Ardys' counsel representing (albeit dehors the record) that both she and Harry

have taken other spouses, our reluctance to compound trouble and tragedy for those helplessly involved in this marital melange, towit, not only the children born to the principals in this case but also those born to their present spouses in previous matrimonial ventures, has dissuaded us from setting aside the decree of divorce to Ardys and thereby leaving the parties in a bigamous fret and stew.

■ Ardys' second point, i. e., "all things being equal in divorce suits custody of children must be granted to the wife, especially if they are young children," presents nothing for appellate review. Dansker v. Dansker, Mo.App., 279 S.W.2d 205, 209(4); Lockhart v. Lockhart, Mo.App., 271 S.W.2d 208, 209(1). It may be recognized as an abstract statement of principle frequently found in similar language, although it should be noted that applicability of this principle is dependent upon "*all other things being equal*" [L——— v. N———, supra, 326 S.W.2d loc. cit. 754–755(5), and cases collected in footnote 7] and that it is said to be particularly relevant where the custody of young *girls* is involved. McKenzie v. McKenzie, supra, 306 S.W.2d loc. cit. 591(6); Wilson v. Wilson, Mo.App., 260 S.W.2d 770, 776(7); Davis v. Davis, Mo.App., 254 S.W.2d 270, 274(6); Armstrong v. Armstrong, Mo.App., 185 S.W.2d 845, 847(4). However, there is no paucity of cases demonstrating that, where the best interests of minor children will be served thereby, custody will be awarded to the father. L——— v. N———, supra, 326 S.W.2d loc. cit. 755(6), and cases collected in footnote 8; Tootle v. Tootle, Mo.App., 329 S.W.2d 218, 224. In fact, that was done in two of the three cases cited in Ardys' brief. Thomas v. Thomas, Mo.App., 288 S.W.2d 689, certiorari denied 352 U.S. 873, 77 S.Ct. 98, 1 L.Ed.2d 77; Cadenhead v. Cadenhead, supra, 265 S.W.2d loc. cit. 436–437. In the final analysis, most of the commonplace truisms reiterated by rote in child custody cases are of scant assistance, for courts award custody not by application of academic principles but by ascertaining, insofar as is humanly possible, what will best serve and promote the welfare of the children involved. That is the only inflexible and unyielding, in fine the paramount and supreme, principle in custody cases. To that principle, all others must yield and give way; and, in its application, there must be no compromise or reservation. See cases collected in West's Missouri Digest, Vol. 11, Divorce, ☞298(1).

With an eye single to the welfare of David and James, we have read and pondered the transcript which, of course, we must take as it comes to us. Bennett v. Wood, Mo., 239 S.W.2d 325, 327(2); Prentice v. Williams, Mo.App., 324 S.W.2d 466, 469(2). Since the court's action in granting a divorce is not under review, the sorry connubial record of Harry and Ardys is of value only insofar as it bears upon the contested issue as to custody of the children [In re Krauthoff, 191 Mo.App. 149, 170, 177 S.W. 1112, 1120; Tootle v. Tootle, supra, 329 S.W.2d loc. cit. 223–224(6)]; and, with the books already bulging with innumerable marital histories reported in minute, tedious and repetitive detail and running the entire literary scale from lurid and racy on the one end to dull and insipid on the other, the instant record affords neither reason nor excuse for more than a summary of the circumstances of primary importance.

■ For more than ten years prior to trial, Harry (characterized by Ardys as "a hard working man") had been employed regularly as a letter carrier working out of the Piedmont post office. His "take-home pay" from this employment was, at the time of trial, "$159.06 every two weeks," and he had some additional income, relatively small and highly variable in amount, from part-time plumbing and electrical work. However, Ardys testified that, although she "didn't like the idea of working" outside the home, "I had to do it," and she quoted her husband as having said that "he would rather I didn't, but if I wanted to, to go ahead." Harry insisted that he

had provided adequately for his family, that it was not necessary for Ardys to work, and that it was "her idea" to do so. In any event, Ardys was engaged, during most of her married life, in some character of house-to-house or customer solicitation such as the sale of greeting cards, hosiery, or "food plans." At first, she averaged "maybe a couple of days a week" but "towards the last * * * I tried to put in five days a week." Whatever her earnings may have been (as to which there was no definite or satisfactory proof), she said that most of it was used for family purposes. To the contrary, Harry stated that Ardys had spent her earnings "as she pleased, entertainment for herself and a few gifts for her friends," and that, so far as he knew, none of it had been used to pay family expenses. We note parenthetically Ardys' concession that "occasionally" she had purchased "gifts to cheer people up," such as "a record player" for a "friend in Piedmont," and her intriguing explanation that "I felt like that would be my tithe to God"—"only with my tithe did I buy gifts," thus suggesting a novel and convenient, though perhaps theologically unorthodox and scripturally unapproved, avenue to nominal compliance with the Biblical injunction, "Bring the full tithes into the storehouse, etc." Malachi 3:10. However, our primary interest in the general subject of Ardys' employment lies not in these *disputed* areas, but rather in the *undisputed* fact, coming from the lips of both parties, that "part of the time" Ardys took the children with her while working and "part of the time" she left them with Harry's mother or "another lady."

Less than three years after the marriage in 1947, Ardys' parents moved to Louisiana, and about 1955 they moved to Dagsboro, Delaware, where they resided at the time of trial. Ardys' relatively frequent trips to visit her parents (she thought "on an average once every eight months" but the record as a whole suggests more frequently than that) were a major source of friction and trouble. Harry charged that Ardys was "emotionally unstable and * dependent on her father for guidance in all of her affairs." Ardys said that hers was "a close family," that she had visited her parents "on the advice of my physician on several occasions when my nerves became bad and I was run down," that "I depended on my father a great deal for comfort and love," and that "he had two heart attacks and I wanted to be near him." On many of these trips, Harry did not accompany his wife. According to Ardys, her husband had visited her parents on only one occasion, that being when he had moved some of their personal belongings from Louisiana to Piedmont for storage. Harry's version was that "I went once a year anyway, sometimes more often than that." In either event, Ardys made a good many trips without her husband and, more importantly here, at least a number of trips without one or both of the children. Ardys remembered that Harry's mother had kept James, the younger boy, "one time" and David, the older boy, "another time," and that a neighbor had cared for David on another occasion. The neighbor, a witness for Harry, stated that about eighteen months prior to trial she had David "one time for five weeks and another time about two or two weeks and a half, and I have had them in and out several times"—"part of the time (Ardys) was working and part of the time she was at her mother's." Both Harry and his mother testified that "at times" Ardys took the children with her and "at times" she left them with the paternal grandparents in Piedmont.

Ardys asserted that her health was "excellent" at the time of trial. However, although we find no express admission of the charge that she was "emotionally unstable," her testimony is replete with comments of which the following are representative, indicating the physical and emotional disturbances which had beset her. (See Baer v. Baer, Mo.App., 51 S.W.2d 873, 879, where the mother, although "of unquestioned good character," was "temperamental and given to spells of anger and irritability.") "I had

pneumonia three times one year and twice another year and my lungs have developed a chronic bronchitis since then. The doctor has told me my health could be very good, that the only thing I need is peace of mind * * *." After each birth, she was nervous, and "the doctor told me (I) needed a peaceful environment and I would be all right with a little love and affection." She has been advised, so she said, to have no more children. After the birth of her second child, she "became hysterical from loss of sleep." One of her major complaints against Harry was that, "instead of putting his arms around me and comforting me he shook me violently and told me, 'shut up and stop that.'" That occasion (disputed by Harry) was the only alleged instance of physical abuse. Denying that she had refused to live with Harry in Piedmont, she quickly admitted that she had "expressed wishes very strongly that we both move"— "I was simply trying to get us together where we could find more in common and get away from the nervous environment I had." We forego specific reference to other incidents, in discussion of which Ardys frequently injected comments about nervousness and medical care, that nothing may be recorded here concerning certain matters which reflect no credit upon either party.

Just what triggered the final separation on December 12, 1959, is not disclosed. Harry's testimony indicated that he understood, when Ardys left on that occasion, that she intended to visit her parents "because of her father's ill health" but that he did not know how long she would be gone. On the other hand, it is abundantly clear from Ardys' testimony that she then contemplated a final separation. But again our primary interest lies not in ascertaining the precise cause of the separation or whether Harry then knew that Ardys had no intention of returning, but rather in examining what occurred then and thereafter as indicative of parental attitudes toward the children. Harry said that, at the time of final separation, Ardys "asked to take" only James, the younger boy, but that "I (Harry) didn't want her to take him." Ardys contended that she would have taken both boys but that her husband told her that "I (Ardys) was not taking the children" and that she left them because "I had no way of getting out of Piedmont with the children." So, "I had this girl friend and her fiance to drive me to the airport" (at an undisclosed location) and both boys, then 10 and 4 years of age, were left with Harry. Protesting that she had not deserted her children, her trial explanation was that "I felt I would let the Lord and the law work it out, but I didn't know it would take so long."

Of course, we cannot say whether or when Ardys invoked divine assistance but the record discloses that she first sought legal succor on January 21, 1960, when her petition in this action was filed. In the meantime, the Christmas season had come and gone with Ardys in Delaware *admittedly* having sent no Christmas gift or remembrance to either child or otherwise having communicated with them until her father was discharged from the hospital, apparently "sometime in January." Her explanation of this was: "My father was in the hospital. I didn't have any money. My father was on the verge of death. I didn't have any money. After Daddy got home I started sending them (the boys) a little money as I could, and I wrote to them and called them often, and Harry was nice. He would always let me talk to them." In this connection we note that, at the trial on July 8, 1960, Ardys stated her intention, if awarded custody of the children, to take them to her parents' home described as a beautiful nine-room home with four bedrooms, and that both Ardys and her mother affirmed the financial ability and the enthusiastic willingness of the maternal grandparents to assist in caring for the children, Ardys' father being identified as a highly-educated man with "three degrees from the university" who "draws from a high bracket as a teacher" in the Dagsboro school system and receives a pension as a

retired lieutenant colonel, a veteran of three wars. Without further factual tedium, the foregoing will suffice to indicate our view that, commendable as was Ardys' love and concern for her parents, the record evidence leaves us with a disappointed, disheartened, distasteful feeling that her love for her children, *as manifested objectively by her conduct,* was not of that sublime character which inspired one of our brethren (now departed) to exclaim that "(t)here is but a twilight zone between a mother's love and the atmosphere of heaven." Tuter v. Tuter, Mo.App., 120 S.W.2d 203, 205.

There being no appellate attack upon the fitness of Harry to have the custody of the children, we need not prolong this opinion by demonstrating such fitness from the record. However, it may not be amiss to add that the paternal grandparents (characterized by Ardys as "good people"—they "were very good to me and I learned to love them") live in Piedmont and, at the time of trial, were caring for James, not then of school age, while Harry was at work; and that both of these grandparents, who appeared before the trial judge, evidenced their readiness and desire to assist Harry in rearing his boys. From the statement in Ardys' brief that Harry has remarried, which we may accept as true for this limited purpose [Baker v. Baker, Mo.App., 274 S.W.2d 322, 327(19)], it is reasonably inferable that there is now a woman in the home who can supervise the children while Harry is gone.

■ All of this is not to say that everything pertaining to Ardys as a mother is figuratively black and everything pertaining to Harry as a father is figuratively white. From the judgment nisi, it is apparent that the trial court did not so find, and neither do we. For that matter, each parent in effect acknowledged, and we think sensibly and properly so, that the other was not unfit to associate with and to have partial custody of the children. Thus, Harry said that he would have no objection to the children visiting with their mother in Delaware, and Ardys conceded that Harry properly might have "partial custody," agreed that "they should know their father," and volunteered that "I would be glad to make arrangements to fly them to the St. Louis airport and return for them there." So, in their testimony the parties wisely recognized, and in his decree the trial judge appropriately applied, the common-sense principle that, where neither parent is unfit, the best interests of minor children will be served by an arrangement which will enable their association with both parents. Lewis v. Lewis, Mo.App., 301 S.W.2d 861, 863(5); Fago v. Fago, Mo.App., 250 S.W.2d 837, 842; Lambert v. Lambert, Mo.App., 222 S.W.2d 544, 548(6); Baer v. Baer, supra, 51 S.W.2d loc. cit. 879(11).

It would seem that, in the final analysis, the dispute here is as to which parent should be awarded *major* custody, i. e., custody during the school year. The decree under review leaves David, now 12½ years of age and in the seventh grade, with the same classmates and playmates he has known from infancy in a wholesome Ozark community having a population of 1,555 according to the 1960 United States census of which we take judicial notice. Varble v. Whitecotton, 354 Mo. 570, 190 S.W.2d 244, 246(4); State at inf. McKittrick ex rel. Martin v. Stoner, 347 Mo. 242, 146 S.W.2d 891, 894(11). David already has attained, and James is verging on, an age at which the guidance, direction, supervision and love of an understanding father are most needed. Lewis v. Lewis, supra, 301 S.W.2d loc. cit. 863; Fordyce v. Fordyce, Mo.App., 242 S.W.2d 307, 314; Green v. Perr, Mo.App., 238 S.W.2d 924, 927; Baer v. Baer, supra, 51 S.W.2d loc. cit. 879. Certainly, further tragedy should not be visited upon these children by separating them, but they should be permitted to continue as brothers in the same household sharing their childish joys and sorrows and benefiting from those natural ties of interest and affection which brothers have a right to nurture and enjoy. L— v. N—,

**532**

supra, 326 S.W.2d loc. cit. 757; Poor v. Poor, 237 Mo.App. 744, 167 S.W.2d 471, 477–478; Tuter v. Tuter, supra, 120 S.W. 2d loc. cit. 205(4); Fisher v. Fisher, Mo. App., 207 S.W. 261, 262.

■ The reported cases are legion in which it has been declared that the findings of the trial court as to custody of minor children, although not binding upon the appellate court, are nevertheless not to be lightly regarded and easily disturbed, but that the appellate court should defer to such findings unless it is firmly convinced that the welfare of the children requires some other disposition. Tootle v. Tootle, supra, 329 S.W.2d loc. cit. 224(9); Ragan v. Ragan, Mo.App., 315 S.W.2d 142, 147(3), and cases collected in footnote 3. We think that principle of deference applicable in the case at bar, where the trial court had an opportunity to see and appraise the parties and their witnesses, and where a meticulous search and painstaking consideration of the transcript leaves us unable to say that the welfare of the two boys, whose lives already have been scarred by their parents' failure, would be best served by some disposition other than that decreed nisi. Of course, the Circuit Court of Wayne County retains continuing jurisdiction, notwithstanding the award of *minor* custody to Ardys during the summer months, to modify the custodial provisions of the decree [Graves v. Wooden, Mo.App., 291 S. W.2d 665, 670(7); Middleton v. Tozer, Mo. App., 259 S.W.2d 80, 88(11); Conrad v. Conrad, Mo.App., 296 S.W. 196, 198(7)] upon sufficiently compelling proof of changed conditions prior to majority of the children or the death of one parent, whichever first occurs. Hayes v. Hayes, 363 Mo. 583, 589, 252 S.W.2d 323, 327(5); In re Wakefield, Mo.App., 274 S.W.2d 345, 347 (5); Schumm v. Schumm, Mo.App., 223 S.W.2d 122, 125(1).

In reviewing this issue of custody, we are acutely conscious that no judicial decree could be entered which would not engender sorrow in some interested party [Abel v. Ingram, 223 Mo.App. 1087, 1091, 24 S.W.2d 1048, 1049] and that no earthly power could recapture for these two boys the blessings of which they have been deprived by the pitiable failure of their parents' marriage. Sanders v. Sanders, 223 Mo.App. 834, 839, 14 S.W.2d 458, 460. But, slight comfort though it may be "that we are in no way responsible for the causes which have unhappily brought about the situation with which we are confronted," it may not be inappropriate to remind the adult principals, "(l)et those whose hearts are wrung remember this when, in their pain and tears, they realize the effect of this decree." In re Krauthoff, supra, 191 Mo.App. loc. cit. 152, 177 S.W. loc. cit. 1113; Graves v. Wooden, supra, 291 S.W. 2d loc. cit. 670.

Let the judgment and decree stand affirmed.

McDOWELL, J., and HUNTER, Special Judge, concur.

RUARK, J., not sitting.