**J., Plaintiff-Appellant,**

**v.**

**E., Defendant-Respondent.**

**No. 8610.**

Springfield Court of Appeals.

Missouri.

June 29, 1967.

Leland C. Bussell, David W. Bernhardt, Bussell, Hough & Greene, Springfield, for plaintiff-appellant.

No appearance for defendant-respondent.

HOGAN, Judge.

This appeal is taken from an order modifying the custody provisions of a divorce decree. J., who was the plaintiff in the divorce action, is the mother of the children involved, and E., the original defendant, is their father. The parties are the parents of three children, a boy fourteen, another boy twelve, and a little girl eight. When the divorce was granted, the father defaulted in appearance, and the court awarded custody of the children to the mother. Subsequently, the custodial order was modified to give the father custody of the children from July 1 to August 15 each year, and during the Christmas vacation on alternate years.

In January 1966, the defendant instituted this action, seeking a further modification of the custodial order. The substance of the defendant's motion was that a change in conditions had occurred, in that the defendant had remarried and had established a home in Colorado Springs, Colorado; that the plaintiff was neglecting the children in several respects, which were set out at some length; that the plaintiff had become "socially involved with married men," and had associated with them in the children's presence. The defendant asked that full custody of the children be awarded to him. The plaintiff filed a responsive pleading, admitting the defendant's remarriage, alleging further that the defendant had attempted to create a feeling of disrespect for the plaintiff in the children's minds by representing that the divorce was all the plaintiff's fault; that defendant had never made his child support payments regularly, and that because of the pressure of inflation the amount originally allowed as child support was insufficient. The plaintiff's pleading concluded with a prayer for an increased amount of alimony and support, and for absolute custody of the children.

The trial court heard the parties' evidence and resolved the controversy by (1) placing G., the elder son, in his father's custody, except for a two-week period during the summer and a period of one week during the Christmas vacation on alternate years; (2) leaving the younger two children with their mother, except for a six-week period

during the summer and for one week during the Christmas vacation on alternate years; and (3) increasing the amount of child support to $20.00 per week per child. The plaintiff has appealed from that part of the order placing G. in his father's custody.

Preliminarily, we may consider and dispose of the reciprocal charges of misconduct made by the parents. G., the elder son, seems to have instigated the proceedings by correspondence or by direct communication with his father. When it became apparent that G. was the source of the information contained in his father's motion for custody, the trial court interrogated the child in chambers, with counsel's permission. G. was asked directly, for example, about the allegation that his mother had become "socially involved" with married men and had "gone out with them" in the presence of the children. G.'s answer was: "Now, I don't know where they got the 'presence of the children.' I have not seen her, and I know [the younger two children] have not seen her. We have suspected it lots of times. [The younger son] has mentioned it once or twice. At night he will be laying in bed, after she goes out, he will say, 'I wonder if she is out with some—where she is at tonight; I wonder if she is with some married man. Don't you think that would be horrible if she was?' And he suspected and I suspected—I don't know whether [the daughter] does or not. * * I remember—I am positive I remember her telling somebody—I am not sure who it was or when it was—that she had gone with somebody—I think it was [a local businessman], I am not positive—and she had gone to such remote places they couldn't get in any way but by boat. And I know it is true; they had a cabin and she—one week end she had to break the car window to get the keys." G. was then asked about the allegation in his father's motion that his mother put the safety of her children in danger by driving recklessly, and he answered, in part: " * * * And she will be following this car, oh, going about thirty or forty miles an hour, and instead of going thirty or forty miles an hour she will drop back about fifteen or twenty feet, and then she will gun it up, race it up to the back of the car and then slow down, drop back and race up. * * * I have noticed that, and whether she thinks I am right or not, there is no need for lying. I particularly watched that, *I knew we were going to have the trial this week.* * * * and I knew [the hearing] was coming up, and Monday afternoon she told me it was going to be this morning. * * * I particularly watched her driving. I knew she wouldn't be dumb enough to go out with a man between then and now. * * * I may sound a little bit like my father. *I want to live with my father, that's all."* (Our emphasis.) The trial court pursued the matter somewhat further, and asked if G. had discussed the father's pleading with his mother. G. answered: "Oh, I read it, and she kept saying 'Don't you know I love you?' and all that. I know she loves me and I know she wants to keep me. And I really—I kinda want to stay with her, but I want to go live with Dad a lot more than I want to stay. I don't know why—I can hardly explain it. A lot of people have asked me this * * *. I always say my father. I can't ever tell them why * * *. Because I love him more, I have been with him more, and I have confidence and trust in him. * * * "

These quotations fairly typify the substance and tenor of the father's proof that the mother was unfit to have custody of the children. Aside from G.'s testimony, and the innuendo of counsel's questions when the plaintiff was cross-examined, there is nothing of substance in the record to indicate that the plaintiff is in any sense an unfit parent. The plaintiff's associates in business testified that she was a diligent and attentive worker. The plaintiff's former "next-door neighbor" testified that the children were clean, healthy and well cared for during the two years she observed them. The children's teachers stated that they were intelligent students making normal progress in school. The mother categorical-

ly denied that she had ever "dated" or had a married man in her house.

The plaintiff mother's complaint about her former husband was that he had attempted to alienate the children's affection and inspire disrespect for her, and that he had failed to contribute to the children's support as he should. The substance of her testimony was that she had had a very difficult time, financially, because the father had only been "caught up" three times in his child support payments. She had been obliged to live solely on her earnings, and had been forced to obtain short-term loans to make ends meet. She produced a witness, formerly associated in business with the father, who stated she had heard the defendant tell the mother, "I will see you in hell before I give you any money," and that the father had repeatedly said if he refused to provide her with money "he would see J. come crawling back * * * because she would have to." The father admitted that he had fallen behind in his support payments, "at one time * * * between four and five hundred dollars," but said that he had refused to pay because he had been denied permission to visit his children. E. testified at the hearing that "I have a check in my pocket for sixty dollars," and that payment of that sum would "pay up until tomorrow." The plaintiff frankly stated that on occasion she had refused the father permission to visit the children, because she "certainly wasn't going to let him have them unless he was current."

As to his present situation, the father testified that he had remarried and had established a home in Black Forest, a rural community of about 900 "families" near Colorado Springs. He was employed as a "carpenter-contractor," had obtained a contractor's license, and was beginning to contract. He earned a "salary of four dollars an hour." His present wife had been married before, and he had adopted the four children of her former marriage. There are three boys and one girl, ranging in age from thirteen to seven, in his adoptive family.

The father, his present wife and their four children, live on a 58-acre tract in a three-bedroom house which the father described as being "modern," and his present wife described as being average. E. was, at the time of hearing, adding to the house and said that when the addition was completed it would have five bedrooms and four baths. He described the community in which he lived as a relatively new one accessible to schools, colleges and churches. Both the father and his present wife testified that the father's adoptive children got along well with his natural children during their summer visits, and neither believed that any problems would be created if the two families lived together. The father's present wife is willing to have his natural children come to her home, and stated that "I feel towards them like I do my own children." E. and his present wife regularly attend church "in town" and he intended to see that his children also attended church on a regular basis.

The plaintiff is employed as a secretary by a real estate firm in Springfield, Missouri. She had been employed there "almost three years." At the time of this hearing, the plaintiff lived "about a block outside" the city of Springfield, Missouri, in a "pretty new" house in which she had acquired "an equity." The house consisted of three bedrooms, two baths, a living room, "family room," a garage, and "just an ordinary lot." The mother's home is about a mile and a half from a modern, well-equipped elementary school to which the children are transported by bus. She has experienced no unusual difficulties with her children, they have done well in school, and she has taken or sent them to church regularly. As we have indicated, the plaintiff's neighbors and the children's teachers indicate that they are healthy and well cared for.

The appellant's argument here is that the evidence presents no change in circumstances or altered conditions which warrant a modification of the custodial order. Ex-

panding on this, she maintains that since there is no substantial evidence that she is unable or unfit to care for her children, and no showing has been made that the children are being mistreated or poorly cared for, there is no reason to separate the family by awarding the custody of one child to the father while the others remain with her.

■ We have largely discounted the mutual and reciprocal charges of personal misconduct and unfitness which the parties have made. It is obvious that they look upon each other with hostility and suspicion; each is inclined to magnify the other's faults. It may be granted that the defendant has not always been as conscientious and prompt as he should have been in remitting his child support payments, and that he seems somewhat over-confident of his ability to rear two families simultaneously upon the means and resources available to him. It may be further granted that the plaintiff emerges from this transcript as a rather flighty and unstable woman, overly imposed upon by circumstances to which she herself has contributed. Neverthelesss, the defendant seems genuinely interested in his children and concerned for their future welfare. The charges of personal misconduct and immorality made against the plaintiff are tenuous and insubstantial, and she seems to have done rather well in caring for her children. The law does not expect parents to be perfect, I. v. B., Mo. App., 305 S.W.2d 713, 718, and the comparative merits of the two parents and their respective homes are not substantial factors in our consideration of this case. The real and substantive question is whether the trial court's award of custody best serves the interests of the children themselves.

■ Child custody cases cannot be decided according to fixed rules, but in view of the appellant's earnest and serious arguments, it may be well in this case to recall some of the general principles involved. As the appellant maintains, the custodial order made in connection with a divorce decree is conclusive as to all matters then adjudicated, and cannot be altered except upon proof of new facts or altered conditions showing that a modification of the order is in the best interest of the child or children involved.[1] But even though the court may not thresh over old straw, Derringer v. Derringer, Mo.App., 377 S.W.2d 513, 515 [3], it is entitled to inquire very broadly to determine whether the original award best serves the interests of the children in the light of actual experience and subsequent developments. 24 Am.Jur. 2d Divorce & Separation, § 820 at 931. Upon a motion to modify, the court must determine what disposition of custody best serves the children at the time the motion is heard, and the children's happiness, their emotional attachments, and their own preferences, provided they are mature enough to make a discriminating choice, are matters as much entitled to consideration as changes in their environment, their parents' misconduct, or any other "changes of condition."[2] We further agree with the appellant that usually, when there are no exceptional circumstances, the children of divorced parents should not be separated by splitting or dividing them between the parents,[3] but it is clearly within the discretion-

---

1. State ex rel. Shoemaker v. Hall, Mo., 257 S.W. 1047, 1053 [7]; P. D. v. C. S., Mo.App., 394 S.W.2d 437, 439 [1]; Wood v. Wood, Mo.App., 378 S.W.2d 237, 239 [1–4]; Hurley v. Hurley, Mo.App., 284 S.W.2d 72, 73 [1, 2].

2. Cook v. Cook, 77 U.S.App.D.C. 388, 135 F.2d 945, 947; Vilas v. Vilas, 184 Ark. 352, 42 S.W.2d 379, 381–382 [1] [2]; du-Pont v. duPont, Del., 216 A.2d 674, 680–681 [21, 22]; Hepler v. Hepler, 195 Va.

611, 79 S.E.2d 652, 658–659 [12] [13]; 2 Nelson, Divorce and Annulment, § 15.19 at 260–263; 1 Schouler, Marriage, Divorce, Separation and Domestic Relations, § 745, and cases cited n. 37 (6th ed. 1921).

3. Kimble v. Kimble, Mo.App., 399 S.W.2d 630, 634 [5–7]; Davis v. Davis, Mo.App., 354 S.W.2d 526, 531–532; Poor v. Poor, 237 Mo.App. 744, 755–756, 167 S.W.2d 471, 477–478 [8]; Fisher v. Fisher, Mo.

ary power of the trial court to make such a division if it is in the best interest of the child or children to do so.[4] And, as the appellant maintains, there are a good many cases holding that it is against the policy of the law to permit a child's removal from the state. I. v. B., supra, 305 S.W.2d at 719, and cases cited n. 7. All the same, the obstacle of nonresidence is not insuperable, and our courts have readily permitted the removal of children to another state when that has appeared to be in their best interest. Good v. Good, Mo.App., 384 S.W.2d 98, 99–100; Lane v. Lane, Mo.App., 186 S.W.2d 47, 50 [2], [3]. As we view the case, the law involved is flexible enough to permit the award of custody made in this instance, if the subjective circumstances justify it.

▆▆▆▆ Though we think the trial court might justifiably have denied a modification of the custodial order, we are not inclined to reverse or modify the judgment which was entered. The trial court made no absolute award of custody to either parent; all three children will continue to have the benefit of association with both parents and, as we have said, the obstacle of nonresidence is not insuperable. It is quite true that neither the passage of time nor the remarriage and establishment of a home by the father are in themselves such changes of condition as require a modification of the custodial order, Thomas v. Thomas, Mo. App., 357 S.W.2d 208, 210–211 [1, 2], but there are other circumstances to be considered here. At this writing, G. is fifteen years old. He is now at an age when the guidance and discipline of a father is most important, and the record plainly shows that he is profoundly dissatisfied with his pres-

ent home and custodian. We do not, of course, know the real source of his antipathy toward his mother, nor the extent to which it is justified. Nevertheless, he is of sufficient age to have a will and express a preference. The weight to be accorded his views depends upon his maturity of mind and capacity to judge, and if the trial court was satisfied that G. was capable of judging what would best promote his own welfare, it might properly have considered his wishes persuasive. We do not say that the modification of a custody order should turn upon the temporary whims or desires of a child; the contrary is true. Kimble v. Kimble, supra, 399 S.W.2d at 634 [4]. Nevertheless, both parents are fit and suitable custodians, and both have good and salutary homes in which the children might live. G.'s desire to live with his father is deep-seated and of long standing. It would only exacerbate an already unfortunate situation to require him to remain with the plaintiff, particularly when we have no doubt he will shortly choose for himself the parent with whom he will live, regardless of what is said.

▆▆▆▆ The findings of the trial court are not binding upon us, but they are nevertheless not to be lightly regarded and should be deferred to by us unless we are firmly convinced that the welfare of the children requires some other disposition. Davis v. Davis, Mo.App., 354 S.W.2d 526, 532 [7]. We cannot say, upon this record, that the interests of the children would be best served by a different disposition of their custody, and the judgment is therefore affirmed.

STONE, P. J., and TITUS, J., concur.

App., 207 S.W. 261, 262–263 [1]; Anno., 98 A.L.R.2d 926, § 2 at 928 (1964).

4. Anno., 98 A.L.R.2d 926, § 3 [a] at 928–929; 2 Nelson, supra, § 15.18 at 258–259; 27B C.J.S. Divorce § 308e at pp. 448–449.