**Una Mae JENSIK, Plaintiff-Appellant,**

v.

**Ronald BOGGS, Defendant-Respondent.**

**No. 33097.**

St. Louis Court of Appeals.

Missouri.

Nov. 19, 1968.

Motion for Rehearing or for Transfer to Supreme Court Denied Dec. 18, 1968.

Richard O. Roberts, Joseph A. Kirkwood, St. Louis, for plaintiff-appellant.

Ronald L. Boggs, Andrew H. McColloch, Charles A. Hurth, Jr., St. Charles, for defendant-respondent.

BRADY, Commissioner.

This is an appeal from a judgment in favor of the father of James Michael Boggs entered upon their mother's action brought under § 452.150, RSMo 1959, V.A. M.S., whereby she sought custody of James Michael, hereinafter referred to as "Jamie" as his name appears in the transcript. She appeals. We will refer to the parties by their designation in the trial court. In stating the facts we must necessarily refer to the original divorce decree and to subsequent motions to modify that decree filed by each of the parties in order to fully

understand the custodial situation existing when the instant action was filed and to place in proper forms the family situation as it existed at that time. Moreover, due to the nature of defendant's argument in support of his contention Jamie's best interests lie in an affirmation of the custodial award entered by the trial court, it will be necessary to refer at some length to the evidence regarding his brother, Mark Christopher, (hereinafter referred to as "Chris" or "Chrisie") and this is true even though, as will later appear herein, the issue of Chris's custody is not before us.

Jamie was born in April, 1959, and Chris in November, 1960. In November of 1961 their parents separated and plaintiff took both children with her and returned to her home prior to her marriage in Kansas. Defendant remained in Missouri and brought Chris to visit him over Christmas of 1961. He has had actual custody of Chris since then. In 1962 a decree was entered granting defendant a divorce. That decree recited the existence of these two children but, stating that only Chris was "physically present" within its territorial jurisdiction, awarded his custody to defendant. No custodial award was made with regard to Jamie. However, the decree did require defendant to support Jamie.

In June of that year defendant filed a motion for modification of the divorce decree alleging the marriage of both parties to others; that plaintiff had wrongfully changed Jamie's last name to that of her present husband; that she instructed Jamie to refer to his natural father by his first name rather than "Daddy", "Father", or some similar parental term; that she refused to accord the father "reasonable rights of visitation and interferes and upsets plaintiff's attempts to spend more than a few days each year with" Jamie leaving the latter "in a condition of uncertainty as to his true relationship with defendant to the detriment" of his mental health; and that Jamie was then physically present within the territorial jurisdiction of the court. The prayer was for custody of Jamie with his mother having reasonable rights of visitation or in the alternative, defendant prayed the court set forth the dates, times and methods of transportation pertaining to his rights of visitation and for its order restraining plaintiff from calling James Michael Boggs the name of James Michael Jensik.

Plaintiff filed a counter motion to modify the divorce decree setting out her actual custody of Jamie and alleging she "had been led to believe and did believe" she had been awarded custody by the divorce court; that Jamie had lived with her except for short periods of visitation during the summer months; that plaintiff prevailed upon her to allow Jamie to go with him and his brother on a vacation trip "with the clear commitment, understanding and agreement that said child would be returned to petitioner at Lawrence, Kansas, on June 18, 1967."; that plaintiff has failed to return Jamie and states he will not do so which is contrary to "all established arrangements respecting the custody of said child and is prejudicial to its welfare and well-being"; and that Jamie lives in a good home, attends school and church and to remove him from there and "attempt to install him in a strange community would cause irreparable harm to and confuse the mind of such a young child." She further alleged she had not been accorded proper visitation privileges as to Chris. Her prayer was for modification so as to award her custody of Jamie and give her visitation privileges as to Chris.

The trial court set a hearing on these motions for August 31, 1967. On that date plaintiff filed her "Petition to Determine Custody of Minor Child" wherein she stated she was proceeding under § 452.150, supra. It is the trial court's decision in that action which is now before us. In her brief plaintiff states this action was taken in response to the trial court's expressed doubt it had jurisdiction to modify as to Jamie who had not been within its territorial jurisdiction at the time the decree

was rendered. The petition alleged the decree; the residence of the parties and children at the time thereof; the absence from the decree of a custodial award as to Jamie; Jamie's residence with her from that time until his return to go on the vacation trip subject to defendant's agreement to return Jamie to her custody; the failure and refusal of defendant to return Jamie; the marriage of each of the parents to others; and that "the best welfare of said child, James Michael Boggs, would be served by this Court granting his permanent custody to petitioner herein." The prayer was for custody of Jamie "in accordance with VAMS Section 452.150 * * *". Defendant's answer denied the allegations of the petition and alleged Jamie's best interests would be served by granting defendant permanent custody because "(a) * * * said child is now in the custody of defendant Ronald Boggs and his present wife, Glenda Boggs in a family home which is well suited to both his physical and emotional needs. (b) That said defendant presently has custody of the brother of said child, namely, Mark Christopher Boggs; that the best interests of both brothers would be served by their remaining together in the custody of defendant, Ronald Boggs." Of course, plaintiff denied such allegations.

At the hearing on the motions to modify plaintiff asked leave to amend her motion so as to request custody of Chris instead of merely additional visitation rights. The trial court indicated if he permitted the amendment he would also grant defendant's request for a continuance. Plaintiff then decided to withdraw her request to amend and proceeded upon her original motion as to Chris only. Defendant then requested and was granted leave to withdraw his motion to modify. This left before the court plaintiff's motion to modify the decree so as to provide her visitation privileges as to Chris and her action under § 452.150, supra. At the hearing counsel agreed "the evidence may be produced simultaneously in both matters, rather than requiring the evidence to be completed on the motion to modify and then proceeding to the other, * * *." It appeared the same witnesses would be used for testimony in both cases.

The evidence was that when he was living with plaintiff Jamie attended school and at the time of trial was ready for the third grade. Plaintiff's husband is a coach in the same school system and was a widower prior to his marriage to plaintiff. He had two children by his first marriage; Jack, a boy aged eleven, and Jan, a girl nine at the time of trial. Their home is a two-story frame with four bedrooms and the other usual rooms including a family room and a basement recreation room. Jamie shares a bedroom with Jack. Plaintiff and her husband are members of and regularly attend the Methodist church in that city and Jamie attends Sunday School. He also goes to Bible school in the summer. He is a Cub Scout, plays on the "ball team" and participates in the city sponsored summer recreation program. He was described by his mother as an active normal boy who makes friends easily and gets along well with other children. When Jamie was due back at her home and didn't arrive, plaintiff called defendant and was told he wasn't going to return Jamie and was filing for full custody. From that time until the day before trial plaintiff called Jamie long distance every week and he also called her once.

Her husband's gross income is approximately $10,000.00 per year. They have an insurance program for the children which includes Jamie as a beneficiary. During the last school year she taught full time but will not be teaching at all anymore. Her husband's summer job required him to be away "a good deal" during the summer but he was home on weekends. She stated Jamie and Chris get along well with each other; argue a lot, but enjoy each other's company. However, "* * * they are terribly jealous of each other * * *." She identified a school record which gave Jamie's name as Jensik and stated she had

heard Jamie call his father "Ron" and that he developed the habit of doing so. She testified Larned, Kansas, where she and Jamie lived since her marriage, was a town of about 5,500 population; that Chris has cerebral palsy and has been receiving treatment over the years at the Shriner's Hospital in St. Louis; that Jamie "kind of fathers" Chris; and that Chris cannot be as active as Jamie due to his illness. Her hours when working were from 9:00 to 3:45 which corresponds with Jamie's school hours; she was with him at home when he was out of school; her school was about six or seven blocks from his; and she made no attempt to alienate Jamie from Chris. She stated the reason he was enrolled as Jensik and referred to by that name was to avoid lengthy explanations by him to other children and not to hide his identity to his father or Chris; that this identity was well known to him; that Jamie participates in swimming, baseball, softball, basketball and football.

Mr. Jensik testified his children by his deceased wife get along well with Jamie and vice versa; that in June or July of 1967 on the occasion of a visit he made to see defendant in St. Charles about Jamie's custody, defendant told him he "had planned to try to get custody of Jamie for some time"; that he was present at the conversation between plaintiff and defendant regarding Jamie's visit in order to go to Florida and defendant promised he would return Jamie on June 18th; that since defendant's refusal to return Jamie Mr. Jensik had spoken with Jamie on numerous occasions over the telephone and Jamie stated he wanted to come back to the Jensik home and return to school; that in September of 1964 he made an attempt to adopt Jamie; that when he did so plaintiff also sought to adopt his children; that the adoption proceedings were dropped (on defendant's objection); and that "Mr. Boggs told me when I visited him at his office this summer * * * that he did not feel that he would get full custody of Jamie. He told me that he did this—he filed for full custody because by doing so he thought he would get him during the summers."

Defendant's evidence was that he was an attorney-at-law practicing in St. Charles; that following the separation and subsequent divorce of the parties he has had Chris in his custody; that his divorce case was a default matter entirely; that there has always been a close relationship between the boys; and that on occasion Chris has awakened during the night and would tell defendant he wanted his brother. Defendant's further testimony was that "Jamie's presence stimulates Chris." He described Chris as having "sort of a passive attitude"; he described Chris's physical ailment as cerebral palsy affecting his right side, particularly his right hand and right leg; he testified the doctor's advice was that only "Chrisie" can do anything about his ailment and that if he attempts to ignore it and not use his right limbs the condition will worsen but that if he exercises them enough and uses them enough they will become almost normal with the additional help of operations planned when Chris is approximately seven years of age. During the two weeks Jamie was visiting in his home during the summer he noticed Chris would try to do things even though he couldn't accomplish them and since Jamie has been with them he noticed a great deal of change in Chris's activities, as for example: " * * * we have a swimming pool right in front of our apartment. Chrisie spends a great deal of time with us in the pool—he spent a great deal of time with us in the pool last summer but he wouldn't try to swim. You would hold him by his stomach and let him lay lengthways in the water and he would just about have a fit. He would not attempt to do anything. In other words, he felt—well, I can't say how he felt but it appeared that he was—he just knew that he couldn't do it in advance of trying, and this was truly his attitude and, yet, this summer, since he has been around Jamie so much, he has now learned how to swim. He has now learned to swim under water the

complete width of the pool. He plays ball now, something that he would never do before. If he can't do—previously, if he couldn't do everything with his left hand, then he would just forget about it—anything that required two hands, he would strike it off—he would not do it no matter how much I tried to prompt him and— * * * Chris has learned to do—through trying to compete with Jamie, he learns to do new things, and I think he has gained a lot more self-confidence about himself. He now plays ball and he bats, for instance—things that he never had done before—not because I didn't try to teach him but because, evidently, my stimulus was not great enough to get him to do it; and, when Jamie came—and Jamie can do all these wondreful things—then Chrisie tries to do them and, in trying, he accomplishes part of it. Q You think this is the result of the competition there between the two brothers? A Most certainly; and there is another feature: When Chrisie was attending nursery school, for instance, he would never fight—if some little boy would shove him, he would run and tell the teacher. He would not do anything back. He was just passive; and, now, he and Jamie get into some pretty good scraps, which I think is very good for Chris. It gives him a lot of confidence. He can belt as hard as Jamie can." His further testimony was that Chris now "does just about anything like that that he thinks is going to help improve him so he can be as good as Jamie is."; that Chris also suffers from serious allergy problems being allergic to "practically everything that all of us come in touch with every day"; that on one occasion when he was returning Jamie to his mother Jamie cried and Chris—whom he referred to as "Chrisie"—cried a great deal and wakes up at night or gets in a "melancholy mood" and wants Jamie.

Defendant stated Jamie loves to swim and to play ball and that he takes him over to the school yard where they play basketball and "try to teach Chris how to play basketball"; that Jamie is a boy who can't have enough activity and needs to be "going" all the time. With respect to Mr. Jensik's testimony as to defendant's statement as to why he attempted to get custody of Jamie, his answer was: "I told him that I didn't know whether or not the Court would give me custody of Jamie but I was at least sure that he would give me visitation privileges as to him and I could, maybe, get him for the entire part of the summer, and that was all that was said"; that this was merely a speculation as to what the court would do and not a statement of his desires, for he desired to have custody of Jamie. He admitted that he had promised the Jensiks he would bring Jamie back at the end of the vacation if they allowed him to take the trip with him. He was asked what made him change his mind and decide not to return Jamie and his answer was: "Well, just seeing them on vacation together, when we had 24 hours a day to spend with them under a very relaxed condition—no stress or strain—we all went down to Florida, and seeing how well they got along together and how good it seemed to be for Chrisie, that Chrisie would attempt to do many of the things that Jamie would do and that Jamie was broadening Chris' interests, at that time when I brought them back, I just decided that now was the time to do it and I did it. Q Did you feel at that time that the best welfare of the children would be for them to remain together? A Yes, sir." He stated the relationship between Jamie and his present wife was a "very warm, lovable friendship" and that Jamie will sit on her lap and hug her and kiss her and go to her with some of his problems; that he first started calling her by her first name but soon began calling her "mommy" and does so except when he talks to his mother. He testified his nine-month income for December, 1966, until the date of trial on the last day of August in 1967 was $7,855.99 gross, and that his business expenses during this time had been approximately $75.00 per month.

On cross-examination he was asked whether he was " * * * more concerned about the welfare of Chris than you are of Jamie?" His answer was: "I think I would have to say that my deepest sympathies are with Chris. I think he needs more help than Jamie." Also during his cross-examination the following appears with reference to this same matter: "Are you motivated in attempting to get custody of Jamie so as to help out Chris? A Part of my motivation is that, yes, sir. Q Do you feel that your gaining custody of Jamie would be in Jamie's best interests? A Yes." He was asked if he had any knowledge as to how Jamie got along with the two Jensik children and he stated that they get along well sometimes but that Jamie has told him he is unhappy there sometimes. He was asked if Jamie had told him he wanted to go to school back in Larned, Kansas, and his answer with regard to this question and Jamie's concern about Jack and Jan Jensik was as follows: "Yes; he has said that and in the same breath said: 'But I want to stay here with you, too.' * * * He was concerned about school starting up there. Q Has he told you that he wanted to get home and see the other two children? A He talks about Jack and Jan, if that is what you are getting at."

Returning again to the question of the well-being of Jamie he was asked the following questions and gave the following answers: "Q Don't you think that the happiness and well-being of Jamie is primarily at stake, here? A Not at all; I think that their interests are almost one and the same. Q Are you telling me that you want Jamie's custody for the sake of Chris? A No; I am not telling you that. That is part of the reason and, partly, is because I love him so much and it is partly because I think he ought to be here. Q You think you would feel the same way about Jamie if Chris wasn't around? A Yes." His testimony was that he thought Mrs. Jensik had done a good job of raising Jamie who was a fine boy.

His further testimony was that he, his wife, Chris, and now Jamie, live in an apartment containing two bedrooms. The boys sleep together and there is a pool outside with a recreational area for the children. He was asked whether since Jamie had been with him he had been in a Day Camp and his answer was: "For about ten weeks or so, he has been. We have a doctor's report that stated that Chrisie is better off in physical, outdoor-type activity than anywhere else. This is a camp where they have fishing. They have a large spring-fed lake. They have ball teams. They have co-ordinated activities for all the boys. Jamie and Chrisie both wanted to go. We take them there at nine o'clock in the morning and we pick them up between four-thirty and five o'clock." Chris and Jamie were enrolled in a regular school for the Fall term. He and his wife are members of the Baptist Church of St. Charles and attend regularly. He admitted that neither of the children had been enrolled in any Sunday School classes. He was asked the following questions and gave the following answers with regard to Chris's emotional makeup: "Is Chris of such a nature that he has to be buoyed up by someone else all the time? A I don't know what you mean by 'buoyed up'. A Well, I mean morally supported—encouraged. A In a way, yes; not all the time but Chris accomplishes much more if he has a competitor or if he has got someone to do things with him that only little kids can do. I can't build a secret hideout and crawl in it with him like a baby. Q Jamie performs this function for Chris very well, apparently? A And Chris performs the function for Jamie. MR. ROBERTS: Well, I take it that your answer is 'yes'. THE WITNESS: I couldn't— Q (By Mr. Roberts) My question was: Jamie performs this function for Chris? A Yes. Q Do you think that when Chris gets started in school and when he begins to make friends in school, that he will enjoy the company of other youngsters his same age? A I hope so, and I am sure that he will. Q And do you

think that at that time these other youngsters will, perhaps, take the place in his activities that Jamie is now taking? A Most certainly not; I don't think there is any chance for that, whatsoever."

He did criticize plaintiff for returning the children to his home at 10:00 o'clock the evening before trial when their bedtime was 8:00 or 8:30 and they had been instructed to return by that time. He also stated the boys were not dressed for the evening and the boys were very cold. He was asked and admitted that plaintiff's father was with the boys and had called his home and told him that he would be delayed and that the children were at the Holiday Inn. He was asked if he had any other criticism of plaintiff as to her upbringing of Jamie and stated: "Yes, there is. Jamie is a boy, in my opinion, with a certain amount of problems. Jamie is not loved the way Jamie should be. Jamie is starved for affection. Every time he is around me, the minute he sees me, his arms go around my neck and they stay there. He is the type of boy that kisses you so much that it is too much. Q And you think this is a reflection on Mrs. Jensik? A Yes; I say if a child is raised right they will be able to manifest their love at home." He also stated that "Jamie is basically a selfish boy and he is rather a spoiled little boy. Q Anything else? A I don't think his personality has developed to its full capacity for a child that age." His testimony was that although his wife worked with him in his law office she intended to leave the office at 3:30, pick up the boys at the school and go on home with them. He stated that he would allow nothing in his business to interfere with his wife doing this.

Mrs. Boggs' testimony was that the competition between the boys is tapering off and was almost all gone at the time of trial. She was asked this question and gave the following answer: "Do they still compete athletically? A Yes, they do and it has been wonderful for Chris; and it has been great for Jamie because he feels like he's the big brother and he gets to teach Chris things to do and I truly believe that he enjoys doing this and the competition has been good for Chris, because when he— well, it has made him want to do the things that Jamie is doing. So far as swimming goes, really Chris wouldn't let Ron or I teach him how to swim. He watched Jamie, who can swim exceptionally well, and he dives in the pool and, as everyone has said, he is an extremely good athlete. It all happened about two months ago— they went swimming every evening during the summer after they got home from Day Camp and, just one day, Chris decided that he was going to stick his face in the water and, before it was over, he was swimming, and they tell us that that is the best exercise that he can have as far as his arm and leg are concerned and we are so thrilled that he could learn from Jamie, and Jamie was as excited as Chris was because we made him feel that he was the one that taught Chris, and he thought that was really something." She stated she was very happy having both children in the home and believed their association with each other was good for both of them. She described Jamie as a "very sweet boy" who has "quite a temper", is considerate and affectionate and seemed starved for affection. Her testimony was that "He only got homesick, actually homesick, two times since he has been with us in three months."

Testimony on behalf of defendant was also given by the witness Dyson, director of the Day Camp the boys attend. He stated the boys have a brotherly affection toward each other and get along very well, and that typically with brothers one looks out after the other—in this case Jamie looks out after Chris. He was asked if he had noticed any change in either of the boys during the three months they had been in Day Camp and stated there had been a definite change in Chris.

A Robert E. Thomas, consulting clinical psychologist, gave testimony on behalf of the defendant to the effect that at the request of defendant he had examined Chris

and Jamie with reference to their psychological development and well-being. He described the tests he had given to the children. His findings with respect to Chris's personality are not of particular importance to the issues to be decided in this appeal except that his conclusion was a portion of Chris's trouble was his "brain damage" and it would be extremely beneficial to Chris to be in Jamie's company. With reference to Jamie, he found him to be a sensitive imaginative and somewhat emotionally intense youngster having very strong protective attitudes toward Chris and conceiving himself at times in almost a father-like role to Chris. He found Jamie to have a normal personality development in a child of his age and stated: "He does have some underlying insecurity and some depression that I think has been brought on by what's been going on around him." It was his opinion that Mrs. Jensik had to be a good mother or Jamie would not have shown the development that he did. It was likewise his opinion that Jamie would never identify with Mr. Jensik and somehow saw Mr. Jensik as the person who has separated his father and mother. He thought that Jamie was very resentful of the fact that he has to be called Jensik and wanted to be called Boggs. It was his conclusion that Jamie would be better off in the Boggs home where he can get the adequate masculine father identity he needs. On cross-examination the expert witness was asked some questions with regard to Chris which have a bearing upon the issue to be resolved here. He found Chris to have an "Immature personality structure with underlying anxiety."

Mr. Jensik returned to the stand to testify that his relations with Jamie were very good and that Jamie had accepted punishment from him with the normal reaction and so far as he knows had never complained of being called Jensik. He also testified that Jack Jensik and Jamie have a very warm and good relationship.

As previously indicated the trial court found in favor of plaintiff on her motion to modify as to Chris, and changed the custodial award so as to allow plaintiff temporary custody of Chris for thirty consecutive days during the summer vacation. This decision has not been appealed and is for our consideration only as it bears upon the issue of Jamie's custody. As to plaintiff's action under § 452.150, supra, to obtain Jamie's custody, the trial court found in favor of defendant and awarded permanent custody of Jamie to him with plaintiff having temporary custody for a period of thirty consecutive days during the summer vacation.

Defendant filed a motion to dismiss this appeal which requires our ruling. His motion is on the ground " * * * appellant has not complied with the provisions of Rule 83.05(a) (2) of the Rules of the Supreme Court of the State of Missouri, as amended, V.A.M.R., as appellant has failed to present a fair and concise statement of the facts without argument." Defendant's motion fails to specify in what respects plaintiff's statement of the facts fails to comply with our rules and while we find some deficiencies in this portion of plaintiff's brief we do not find them to be so flagrant or of such a serious nature as to require dismissal of this appeal. Defendant's motion is denied.

Defendant also filed a "Motion to Affirm Judgment for Defendant Ronald Boggs". The only matter in that motion requiring our attention is the contention plaintiff has failed to preserve any issue on appeal by failing to comply with Civil Rule 79.03, V.A.M.R., by failing to contain in her motion for new trial any briefed assignment of error. We cannot agree with defendant. While not in the identical language, Paragraph 8 of the motion for new trial in essence presents the allegation of error briefed by plaintiff; i. e., the trial court erred in awarding custody of Jamie to defendant as his best interests required his return to plaintiff's custody. The motion is denied.

In reviewing appeals of this nature we are adjured to defer to the trial court

in matters where conflicting testimony is involved, but our essential duty is a review of the case de novo arriving at our own independent findings of fact and reaching our own conclusions upon the evidence. We are not to apply the rule of deference so as to avoid these duties. Heibel v. Heibel, Mo.App., 366 S.W.2d 37. It first might be well to make clear that we do not in this opinion rule upon the correctness of the trial court's theory it had no jurisdiction to enter a custodial award as to Jamie who was outside of its territorial jurisdiction at the date of entry of the decree. That matter is not before us and we in no way approve or disapprove the trial court's theory in this regard.

It has been well said in Davis v. Davis, Mo.App., 354 S.W.2d 526, l. c. 528, that: " * * * In the final analysis, most of the commonplace truisms reiterated by rote in child custody cases are of scant assistance, for courts award custody not by application of academic principles but by ascertaining, insofar as is humanly possible, what will best serve and promote the welfare of the children involved. That is the only inflexible and unyielding, in fine the paramount and supreme, principle in custody cases. To that principle, all others must yield and give way; and, in its application, there must be no compromise or reservation. See cases collected in West's Missouri Digest, Vol. II, Divorce, ☞298 (1)." In the Davis case there were several children involved and we think the error in the trial court's decision in the instant case arises from the mistaken belief that there are two children involved in the instant case. There are not—only Jamie is involved. Only as Chris's welfare helps determine what is best for Jamie does Chris come into our consideration. This issue was clouded at trial due to the agreement to hear evidence on the motion to modify as to Chris at the same time as evidence on the instant case. As a result we think it apparent the issue of how much Chris needs Jamie was allowed undue weight. We have perhaps unduly extended the length of this opinion by recitation of testimony which, though appearing at different and often widely separated places in the transcript, we find to be a fair representation of the general tenor of the evidence. The whole of the evidence leads inescapably to the conclusion defendant's testimony Jamie's best interest would be served by keeping him with Chris was in fact based upon the theory Jamie could best grow and benefit from the satisfaction he could realize from helping his brother. No one can read defendant's evidence as set forth in the transcript without coming to the inescapable conclusion defendant was exhibiting great candor when he stated his " * * * deepest sympathies are with Chris". It is likewise clear his reference to Jamie as "selfish" and "spoiled", in direct contradiction of his own previous testimony, arose from his feeling Jamie and plaintiff should be willing, indeed anxious, for Jamie to make whatever sacrifice to his own well-being necessary to help Chris. Every question defendant was asked with regard to Jamie was answered by relating some aspect of Jamie's influence upon Chris.

For example, defendant's testimony Chris wakes up at night and wants Jamie or gets in a "melancholy mood" and wants his brother, as well as his testimony that Chris's nature was such that "in a way" he needs to be supported and encouraged all the time and that Jamie performs this function for Chris, is testimony which shows defendant, while giving lip service to the ideal of Jamie's welfare, was in fact governed by his understandable desire to see that Chris continues to receive the benefits derived from association with Jamie. In fact, defendant's decision to renege upon his promise to return Jamie to his mother sprang from the same frame of mind. He testified he arrived at that decision because he saw " * * * how well they got along together and how good it seemed to be for Chrisie, that Chrisie would attempt to do many of the things that Jamie would do and that Jamie was broadening Chris's interests, at that time when I brought them

back, I just decided now was the time to do it and I did it" is illustrative of the same frame of mind on the part of defendant. To the same effect was defendant's testimony when asked if he thought when Chris gets started in school and begins to make friends he would enjoy the company of other youngsters his age and if these other youngsters would perhaps take the same place in Chris's life that Jamie is now taking. His answer was "Most certainly not; I don't think there is any chance for that, whatsoever". It may be improbable for a friend to become as close as a brother to a boy of Chris's physical and mental deficiencies, yet it is not impossible. In any event, defendant's answer in effect foreclosed any degree of friendship whether it be as close as brotherhood or not and showed clearly a frame of mind whereby regardless of whether or not such an event should occur defendant is of the firm conviction Jamie was to continue, presumably for the rest of his life, to supply this need for Chris. We do not disparage the worth of such experience. Unselfish sacrifice for the welfare of another is indeed character building. Neither do we intend to imply defendant's attitude toward his less fortunate son is beyond our understanding. But we do not agree whatever benefits Jamie would derive therefrom should be allowed to overweigh the fact he would in fact be taken from the home environment and care he has known almost all of his life; a home environment and care where he has prospered and developed into what all the parties agree is essentially a fine, well-adjusted boy; one where, evidenced by his concern over school starting without him, he has the strong emotional ties to be expected after spending practically all his life there.

Moreover, we note Jamie was eight at the time trial occurred. We believe the continued encouragement of his development of a "father-like role" may well be harmful at such an age. Particularly is this true when he will be required to adopt that role toward his brother who, according to defendant's expert, has some brain damage and an "immature personality structure with underlying anxiety". This same witness stated Jamie's only personality faults—underlying insecurity and depression—had been brought about "by what has been going on around him". The fair inference is that if Jamie remains with defendant the continued pressure of adopting a "father-like role" at his tender age may well adversely affect what is now a normal personality development. Neither are we impressed by the expert's finding of resentment toward Mr. Jensik. If such resentment does exist it cannot be a large factor for the same witness found Jamie so well adjusted.

We cannot help but contrast Jamie's personality and character development as found by defendant's own expert (credit for which was given by that same witness to defendant) with that same expert's findings in this regard as to Chris. Of course, some of Chris's "personality structure" deficiencies must spring from his physical disability and some may well come from the fact that prior to defendant's present marriage Chris lived with his grandparents. But the fact remains his deficiencies remained unaffected, so far as this transcript discloses, by his life with defendant and his wife.

In essence defendant asks this court to cast aside all other matters and to determine the issue of Jamie's well-being solely upon the benefits he may derive from assisting Chris overcome the serious mental and physical deficiencies with which he is unfortunately afflicted. Jamie's welfare must not be circumscribed by such narrow boundaries. His welfare must also be considered in the light of what the adoption of such a heavy burden as defendant has placed and from the transcript undoubtedly intends to place upon him will have upon the development of his own personality and life. Viewed in this light we must state that we are unwilling to require Jamie to so sacrifice himself. Indeed, we are of the opinion under such circumstances Jamie's

present affection toward his brother might well turn into a far different emotion. Plaintiff's custody of Jamie does not mean that Jamie cannot make a real and meaningful contribution toward his brother's well-being. This he may do during the periods of defendant's temporary custody as provided later herein.

■ Accordingly, we hold the judgment must be reversed and the cause remanded to the trial court with instructions that it enter its decree awarding permanent custody of Jamie to plaintiff with the defendant having the right to temporary custody of said child for a period of forty-five consecutive days each year during the summer school vacation; defendant to give plaintiff at least ten days' written notice each year of the date he desires such temporary custody to commence; and plaintiff is to provide at her expense for the transportation of Jamie to and from defendant's residence. The fee for the amicus curiae is not in issue here and as awarded by the trial court should be incorporated in the decree to be entered in accordance with this opinion. In the interest of justice we have determined the costs in the trial court and of this appeal are to be equally divided.

PER CURIAM:

The foregoing opinion by BRADY, C., is adopted as the opinion of this court. Judgment reversed and cause remanded to trial court with instructions to enter its decree awarding permanent custody of James Michael Boggs to plaintiff; defendant to have temporary custody of said child for a period of forty-five consecutive days each year during summer school vacations; defendant to give plaintiff at least ten days' written notice each year of the date such temporary custody to begin; plaintiff to provide for transportation of said child to and from defendant's residence in St. Charles, Missouri; and awarding fee to amicus curiae in the same amount as originally granted by the trial court. Costs in the trial court and of this appeal to be equally divided between plaintiff and defendant.

ANDERSON, P. J., and RUDDY and WOLFE, JJ., concur.